**UNITED STATES of America**
**v.**
**John William BUTENKO and Igor A. Ivanov.**

**Appeal of Igor A. IVANOV.**
**No. 72–1741.**

United States Court of Appeals, Third Circuit.

Argued March 20, 1973.

Reargued en banc Nov. 15, 1973.

Decided March 5, 1974.

As Amended April 9, 1974.

---

Seitz, Chief Judge, filed a concurring and dissenting opinion in which Van Dusen, Circuit Judge, joined and Aldisert, Circuit Judge, .joined in part, Aldisert, Circuit Judge, filed a concurring and dissenting opinion in which Van Dusen, Circuit Judge, joined, and Gibbons, Circuit Judge, filed a dissenting in part opinion.

Jonathan L. Goldstein, John J. Barry, Edward J. Dauber, Asst. U. S. Attys., Newark, N. J., A. William Olson, Asst. Atty. Gen., Robert Keuch, Internal Security Div., Dept. of Justice, Washington, D. C., Herbert J. Stern, U. S. Atty., for appellee.

Edward Bennett Williams, Vincent J. Fuller, Robert L. Weinberg, Williams, Connolly & Califano, Washington, D. C., for appellant.

Argued March 20, 1973

Before SEITZ, Chief Judge, and ALDISERT and ADAMS, Circuit Judges.

Reargued en banc November 15, 1973

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Among the more perplexing dilemmas faced by a democractic society is that of securing its territorial and institutional integrity, while at the same time, preserving intact the core of liberties essential to its existence as an association of truly free individuals.

The disposition of this appeal, which requires us to consider the relationship between the federal government's need to accumulate information concerning activities within the United States of foreign powers and the people's right of privacy as embodied in statute and the Fourth Amendment, represents, in effect, part of the federal judiciary's attempt to strike a proper balance between these two compelling, albeit not easily reconciled, interests.

The present appeal is the most recent episode in this provocative and protracted litigation.[1] At a trial concluded on December 2, 1964, appellant Igor A. Ivanov, a Soviet national, and John Butenko, an American by birth, were convicted of conspiring to violate the provisions of 18 U.S.C. § 794(a) and (c) and 18 U.S.C. § 951. These statutes, in essence, prohibit the transmission or communication to a foreign government of material or information relating to the national defense, and forbid a person from acting as a foreign agent absent prior notification to the Secretary of State. In a previous appeal, Ivanov and Butenko contended that the evidence offered by the government, which tended to implicate them in an attempt to purloin highly sensitive information concerning the Strategic Air Command, was insufficient to support the averments in the indictments and, hence, their convictions could not stand. This Court agreed with Ivanov's contention with respect to his conviction for violating § 951, but otherwise affirmed the judgment of the district court.[2]

Ivanov and Butenko then sought certiorari in the Supreme Court. While their petitions were pending, the government voluntarily revealed that it had overheard, by means of electronic surveillance, conversations of Ivanov and of Butenko. The Supreme Court thereupon granted certiorari, limited to questions of standing and the government's obligation to disclose the records of wiretaps determined to be illegal. In addition, the Court consolidated appeals of Ivanov and Butenko with another case involving similar issues.[3] After oral argument, the Supreme Court held that records of *illegal* surveillance must be disclosed to Ivanov and Butenko, and remanded the cases to the district court for

A hearing, findings, and conclusions (1) on the question of whether with respect to any petitioner there was electronic surveillance which violated his Fourth Amendment rights, and (2) if there was such surveillance with respect to any petitioner, on the nature and relevance to his conviction of any conversation which may have been overheard through that surveillance.[4]

On remand, the district court was presented with requests for disclosure of the records of two sets of interceptions. Pursuant to the Supreme Court's directive, the district court, after conducting

---

1. See Judge Aldisert's concurring and dissenting opinion herein for a fuller exposition of the factual background of this case.

2. 384 F.2d 554 (3d Cir. 1967).

3. Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

4. *Id.* at 186, 89 S.Ct. at 973.

a hearing, found that information contained in the first set of interceptions, conceded to be illegal by the government, had not tainted the convictions of Ivanov or Butenko.[5] After examining the records of a second set of interceptions *in camera,* the district court held that the electronic surveillance producing these records did not violate § 605 nor contravene the Fourth Amendment.[6] The district court, therefore, declined to order the government to disclose to Ivanov and his counsel the records of the second set of interceptions or to conduct further proceedings with respect thereto.[7] Accordingly, the district court directed that new judgments of conviction be entered.

Ivanov challenged the new judgment of conviction as to him. He asserted that the loss or destruction of some of the records dealing with the first set of interceptions prevented the government from sustaining its burden of demonstrating that his conviction was not tainted by these interceptions and may have deprived him of exculpatory evidence. Additionally, Ivanov contended that the district court erred in failing to require disclosure to him and his counsel of the records of the second set of interceptions, which he claimed violated § 605 of the Communications Act of 1934, or, if the Court found them to be permissible under § 605, his Fourth Amendment rights.

A panel of this Court, in an opinion filed June 21, 1973, unanimously declined to reverse the district court's finding of no taint as to the first set of interceptions. However, the panel concluded, by a 2–1 vote, that the second set of interceptions fell within the parameters of § 605 and that, therefore, the divulgence of the contents of that set of taps, for the purpose of trial, was illegal. Consequently, the panel remanded to the district court for disclosure to Ivanov and his counsel of the records of the second set of interceptions and for an evidentiary hearing to determine whether they tainted his conviction.

The government petitioned the Court in banc for a rehearing of that portion of the panel's decision ordering disclosure and an evidentiary hearing dealing with the second set of surveillances. Ivanov filed a petition for rehearing, conditioned on the government's obtaining rehearing, contending that the panel was incorrect in concluding that the government had produced all the records previously ordered disclosed relating to the first set of interceptions. The full Court granted the government's petition for rehearing, but denied that of Ivanov.

Thus, the principal question before the Court in banc is whether it is sufficient that the records of the second set of interceptions be disclosed to the district court *in camera,* or whether the government must also disclose to Ivanov and his counsel the records of this set of interceptions.

## I. THE DISCLOSURE RE-QUIREMENT

In Alderman v. United States,[8] the Supreme Court held that the government must disclose to Ivanov and the other defendants all records of *illegal* surveillances, without a prior *in camera* review by the trial judge, for the purpose of determining if the records contain material relevant to the government's case. The Supreme Court concluded that once the interceptions are ascertained to be illegal, "the task [of determining taint] is too complex, and the margin of error too great, to rely wholly on the *in camera* judgment of the trial court to identify those records which might have contributed to the Government's case."[9]

---

5. 342 F.Supp. 928 (D.N.J.1972).

6. 318 F.Supp. 66 (D.N.J.1970).

7. The government appears to have disclosed to Butenko's counsel *all* records of wiretapped conversations involving Butenko. *Id.* at 68 n. 2.

8. 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

9. *Id.* at 182, 89 S.Ct. at 971.

The Supreme Court made clear in Taglianetti v. United States[10] that the necessity of disclosure, in cases not involving *illegal* surveillance, depended upon the likelihood that accurate determinations of the particular factual or legal issues in dispute were otherwise unobtainable. *"Nothing in [Alderman, Ivanov, and Butenko]* . . . *requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance."* [11] (Emphasis added) Apart from ascertaining whether evidence derived from *illegal* surveillances tainted a conviction, it remains within the trial judge's discretion to require or not to require disclosure of records of surveillances to facilitate resolution of questions surrounding electronic surveillance.[12]

Thus, if we are to require disclosure of the records of the second set of interceptions, we must conclude either (1) that the electronic surveillances producing such records were illegal or (2) that the trial judge abused his discretion in refusing disclosure.

In dealing with the former considerations—assessing the legality of the government's activities with regard to the second group of surveillances, we must first decide whether § 605 prohibits the surveillances at issue. If we should decide that the prohibitions of § 605 do not cover these surveillances, we must then proceed to determine whether Ivanov's Fourth Amendment rights have been transgressed.[13] Lastly, if we should hold that this set of surveillances

were not illegal, we must, in accordance with the instructions of the Supreme Court, evaluate the trial judge's exercise of discretion in refusing disclosure.

We shall address these three issues seriatim.

## II. SECTION 605 OF THE COMMUNICATIONS ACT OF 1934 DOES NOT PROHIBIT THE INTERCEPTION AND DIVULGENCE OF THE CONTENTS OF ELECTRONIC SURVEILLANCE IN THE FOREIGN AFFAIRS FIELD MADE PURSUANT TO EXECUTIVE ORDER.

Section 605 of the Communications Act provides in relevant part that "no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." [14]

This section prompted considerable discussion as electronic surveillance became a more sophisticated and widely used device for the investigation of criminal activity. Much of the clamor for reform centered around the scope given to the section by the *Nardone* cases.[15] Petitioners in those cases were tried and convicted of smuggling alcohol. Over their objection, federal agents were permitted to testify to the substance of petitioners' telephone conversations that were wiretapped and overheard by the witnesses. In *Nardone* I, the Supreme Court held that, under §

---

10. 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969) (per curiam).

11. *Id.* at 317, 89 S.Ct. at 1100.

12. Note, The Supreme Court, 1968 Term, 83 Harv.L.Rev. 60, 175 (1969).

13. Ivanov contends that the Solicitor General conceded at oral argument before the Supreme Court in *Alderman* that the second set of interceptions were unconstitutional. *See* Giordano v. United States, 394 U.S. 310, 313–314 n. 1, 89 S.Ct. 1163, 22 L.Ed.2d 297 (Stewart, J., concurring). Assuming arguendo that Ivanov is correct in this regard, it appears that the Supreme Court refused

to accept any such concession and, instead, ordered the district court on remand to consider the question of the legality of these surveillances. Alderman v. United States, 394 U.S. 165, 186, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). *See* United States v. Butenko, 318 F.Supp. 66, 69 (D.N.J.1970).

14. 47 U.S.C. § 605.

15. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937) [*Nardone I*]; Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) [*Nardone II.*]

605, " 'no person' comprehends federal agents, and the bar on communication to 'any person' bars testimony to the content of an intercepted message." [16] On re-trial, the prosecution attempted to present evidence gathered as a result of the illegal taps instead of testimony as to the actual contents of the overheard conversations. The Court, in *Nardone II*, made clear that the "fruits" of the taps, as well as the intercepted materials themselves, were inadmissible.

In response to the ostensible debilitating threat to federal investigatory activities presented by the interpretation placed on § 605 by the *Nardone* cases, the Department of Justice adopted the position "that the mere interception of telephone communications is not prohibited by federal law." [17] The government, therefore, continued to wiretap after the *Nardone* cases even though aware that those cases, at least when the surveillances were conducted during the course of an investigation of domestic criminal activity, precluded the introduction of the records or fruits thereof into evidence. Meanwhile, the Department of Justice pressed for legislation lifting the evidentiary limitations erected on the foundation of § 605 by the *Nardone* cases. It did so on the obvious ground that the ability to use electronic surveillance to secure evidence in criminal convictions would make surveillance a more effective weapon against crime. The Department's efforts were finally successful with the enactment of the Omnibus Crime Control and Safe Streets Act of 1968, which specifically authorizes any

electronic surveillance with prior judicial authorization.[18] To contend, as Judge Aldisert does, that these efforts by various Attorneys General, constituted a concession that § 605 proscribed the introduction into evidence of material seized as a result of such surveillance does not seem realistic.[19] The Attorneys General were advocating new legislation narrowing the potential ambit of § 605 and, in that context, suggesting that § 605 might be broad enough to reach situations like that presented in this case, no doubt represented sound strategy. In addition, the Supreme Court, in the *Nardone* cases, was dealing with the warrantless electronic surveillance of suspected domestic criminals during routine investigations by federal agents. In the present case, we are faced with the significantly different situation of warrantless electronic surveillance pursuant to presidential directive in the sensitive area of foreign intelligence information gathering. It, therefore, would not seem appropriate to regard those cases as controlling here. Only one court of appeals has been faced with circumstances similar to those here and it dealt with the issue obliquely, if at all.[20] The Executive Branch's continuing assertion of the power to wiretap per se and the conclusion that the use of intercepted material as evidence was prohibited by § 605 [21] and, thus, that the provision had an incidental effect not unlike a rule of evidence, does not, as Judge Aldisert urges, inexorably lead to the proposition that the statutory proscription against divulgence represented an evidentiary rule.[22] The legislative

16. 302 U.S. at 381, 58 S.Ct. at 276.

17. Rogers, The Case for Wire Tapping, 63 Yale L.J. 792, 793 (1954) ; Brownell, Public Security and Wire Tapping, 39 Cornell L.Q. 193, 197–98 (1954).

18. 18 U.S.C. §§ 2510–2520.

19. During the period covered by the law review articles referred to in Judge Plusert's dissent, electronic surveillances in the field of foreign affairs were made without prior warrants. Indeed, in the instant case, the surveillances were made during the time the

late Robert Kennedy was the Attorney General.

20. *See* p. 605 *infra.*

21. *See, e.g.,* Sablowsky v. United States, 101 F.2d 183 (3d Cir. 1938).

22. *Cf.* Developments in the Law—The National Security Interest and Civil Liberties, 85 Harv.L.Rev. 1130, 1249 (1972). *But see* Sablowsky v. United States, 101 F.2d 183, 189 (3 Cir. 1938) where Judge Biggs stated that "the Nardone Case holds clearly that Section 605 creates a rule of evidence. . . . "

history relating to § 605 is bereft of any suggestion that Congress intended to fashion a rule of evidence. On the contrary, the language of the statute seems to reach *any* divulgence, by the way of introduction into evidence *or otherwise*, of information obtained by way of wiretaps that would compromise the privacy of those whose conversations are overheard. Furthermore, the fact that the restrictions contained in § 605 have been enforced through the exclusion of evidence at a criminal trial should not obscure the broader aim of the statute— the discouragement of the interception of communications.[23]

 ■ Thus, in our view, and apparently that of Judge Gibbons, who today dissents on other grounds, § 605 would appear to prohibit divulgence of intercepted communications obtained by electronic surveillances that are deemed within the parameters of the provision. Moreover, restricting any divulgence to members of the Executive Branch, as Judge Aldisert suggests, does not neces-

sarily mean that the surveillance and such divulgence does not run afoul of § 605.[24] The proscriptions of § 605 are directed to surveillances generally, and the conjunction, "and," separating "interception" and "divulgence," does not seem intended to invite separate analysis. There is absolutely no indication that Congress contemplated situations where interceptions were unaccompanied by divulgences.

 ■ However, the conclusion that § 605 extends to all divulgences to any person of any surveillances within the provision's ambit does not exhaust our inquiry into the lawfulness of the wiretaps in the case at hand. We still must determine whether § 605 reaches the type of surveillances producing the records that the district judge has refused to order disclosed to Ivanov and his counsel. Specifically, the question left unanswered is whether § 605 is to be construed to restrict the President's authority to gather foreign intelligence information and use such information to assist in securing criminal convictions.[25]

---

23. If, for example, a civil suit were brought by a participant in the conversation, against persons who illegally overheard a conversation, the purpose of the statute—to deter surveillance—would be furthered by some disclosure, at least to the extent such disclosure is necessary to establish the claimed unlawful interception. *Cf.* Bivens v. Six Unknown Named Agents of FBI, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

24. It might be contended, if the "any person" language of the statute were construed liberally, that a divulgence solely within the Executive Branch would not violate § 605. This construction of § 605 would seem to divide the permissible from the impermissible channels of communication for intercepted material along lines not susceptible to explanation in terms of effective governmental response to potentially unlawful activity or in terms of the privacy interests implicated by the statute. Under this interpretation, for example, the Attorney General could openly transmit the contents of intercepted messages through the labyrinthine federal bureaucracy with the attendant risk of substantial invasion of privacy unfettered by even the hortatory effects of § 605, while a discreet revelation of the same material to an officer of a state to aid the latter in ful-

filling his law enforcement duties would be proscribed.

25. With the passage of the Omnibus Crime Control and Safe Streets Act of 1968, it appears that the only limitations on the President's authority to engage in some forms of electronic surveillance are those set forth in the Constitution. Section 2511(3) provides as follows:

 Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any

Keeping in mind that § 605 embodies a limitation on the power to engage in surveillance generally, we begin our analysis of the remaining question under the statute with the proposition that the President is charged with the duties to act as Commander-in-Chief of the Armed Forces [26] and to administer the nation's foreign affairs,[27] powers that will receive fuller treatment in subsequent portions of this opinion.[28] To fulfill these responsibilities, the President must exercise an informed judgment. Decisions affecting the United States' relationships with other sovereign states are more likely to advance our national interests if the President is apprised of the intentions, capabilities and possible responses of other countries. Certainly one means of acquiring information of this sort is through electronic surveillance. And electronic surveillance may well be a competent tool for impeding the flow of sensitive information from the United States to other nations.

In enacting § 605, the Congress did not address the statute's possible bearing on the President's constitutional duties as Commander-in-Chief and as administrator of the nation's foreign affairs. The Senate and House reports suggest that the purpose of the Communications Act was to create a commission with regulatory power over all forms of electrical communications, whether by telephone, telegraph, cable or radio.[29] There appears to have been little or no discussion at all in Congress regarding § 605. Indeed, had Congress explored the question, it no doubt would have recognized, as Judge Gibbons' extensive discussion may well

indicate, that any action by it that arguably would hamper—since as we have previously concluded § 605 is intended to prohibit surveillances generally—the President's effective performance of his duties in the foreign affairs field would have raised constitutional questions. We do not intimate, at this time, any view whatsoever as to the proper resolution of the possible clash of the constitutional powers of the President and Congress. Instead, we merely note that the absence of legislative consideration of the issue does suggest that Congress may not have intended § 605 to reach the situation presented in the present case. In the absence of any indication that the legislators considered the possible effect of § 605 in the foreign affairs field, we should not lightly ascribe to Congress an intent that § 605 should reach electronic surveillance conducted by the President in furtherance of his foreign affairs responsibilities. This would seem to be far too important a subject to justify resort to unsupported assumptions.

The Attorney General has certified, Ivanov does not deny, and the district court has found, that the surveillances at issue here "were conducted and maintained solely for the purpose of gathering foreign intelligence information."[30] Therefore, § 605 does not render them, in and of themselves, accompanied by subsequent disclosure, unlawful.

Although decisions subsequent to United States v. Coplon [31] hold that § 605 does not limit the President's powers to gather foreign intelligence information,[32] we are aware that Coplon

---

wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power.

26. U.S.Const. Art. II § 2.

27. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319–322, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

28. *See* pp. 611, 612, 615 *infra*.

29. *See* Sen.Rep.No.781, 73d Cong., 2d Sess. 1 (1934), H.R.No.1850, 73d Cong., 2d Sess. 3 (1934).

30. 318 F.Supp. 66, 70–73.

31. 185 F.2d 629 (2d Cir. 1950).

32. United States v. Clay, 430 F.2d 165 (5th Cir. 1970), rev'd on other grounds, 400 U.S. 990, 91 S.Ct. 457, 27 L.Ed.2d 438 (1971); United States v. Hoffman, 334 F.Supp. 504 (D.D.C.1971); United States v. Dellinger,

may be read to undercut the position urged here as well as in the other cases subsequent to *Coplon*. We do not, however, despite our high regard for the late Judge Learned Hand, give to that case the conclusive reading suggested by Judge Gibbons. There, the court did not consider in any detail whether wiretaps for the purpose of gathering foreign intelligence information fell within the ambit of § 605. A close reading of the briefs in *Coplon* indicates that the question was not raised. Instead, the court merely assumed that the surveillance and disclosure together were illegal under § 605.[33] In the absence of any reasoning undergirding this assumption, we do not consider it is entitled to any great precedential effect and decline to adopt it here.

## III. IVANOV'S FOURTH AMENDMENT RIGHTS WERE NOT INFRINGED.

Because of our conclusion that § 605 of the Communications Act neither prohibits the President from gathering foreign intelligence information nor limits the use to which material so obtained may be put, it becomes necessary to determine whether the surveillances producing the second set of records invaded Ivanov's Fourth Amendment rights. If the surveillances did violate Ivanov's constitutional rights, then disclosure of the records and a suppression hearing may be required under the mandate of the Supreme Court.[34]

1. *The Applicability of the Fourth Amendment to Electronic Surveillances Conducted Pursuant to the President's Foreign Affairs Powers.*

The expansive language of United States v. Curtiss-Wright Export Corporation[35] provides support for the contention that the President is authorized to act unencumbered by the Fourth Amendment requirements of prior judicial approval and probable cause when he is dealing with national security matters.[36] The ramifications of *Curtiss-Wright*, however, remain somewhat enigmatic in this regard. To contend that customary Fourth Amendment analysis is to be abandoned whenever the

Crim. No. 60 CR 180 (Mem.Op.N.D.Ill. Feb. 2, 1970), *rev'd on other grounds*, 472 F.2d 340 (7th Cir. 1972) ; United States v. Butenko, 318 F.Supp. 66 (D.N.J.1970) (the present case in the district court) ; United States v. Brown, 317 F.Supp. 531 (1970), rev'd on other grounds, 456 F.2d 1112 (5th Cir. 1972) ; United States v. Stone, 305 F.Supp. 75 (D.D.C.1969). *Compare* United States v. Smith, 321 F.Supp. 424 (D.C.Cal.1971) (distinguishing domestic situation) ; United States v. Sinclair, 321 F.Supp. 1074 (E.D. Mich.1971) (same) *aff'd sub nom.*, United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

33. *Id.* 185 F.2d at 636.

34. *See* pp. 598–599 *supra.*

35. 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936). The Court in *Curtiss-Wright* held that the Congress' delegation to the President of the authority to prohibit the sale of weapons to certain countries engaged in hostilities with each other was not unconstitutional.

36. "The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers is categorically true only in respect of our internal affairs.

. . . . .

"Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation.

. . . . .

"[H]e, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results." *Id.* at 315–320, 57 S.Ct. at 219.

President asserts that a particular search and seizure is incident to the conduct of foreign affairs activities is arguably uncongenial with a reasoned view of the relationship among the relevant constitutional provisions and the thrust of the Supreme Court decision in United States v. United States District Court.[37] We take no such position here.

▉ The President in his constitutionally designated role as Chief Executive[38] is charged with the duty to see that the laws of the United States are enforced and obeyed. Yet it is incontrovertible that the President, through his subordinates, cannot ignore the admonitions of the Fourth Amendment when investigating criminal activity unrelated to foreign affairs. Thus, evidence seized in the investigation of domestic crimes as a result of actions outside the bounds of the Amendment would not be admissible in a criminal prosecution.[39] The President's authority to conduct foreign affairs similarly is implied, at least in part, from the language contained in Article II of the Constitution.[40] The Constitution contains no express provision authorizing the President to conduct surveillance, but it would appear that such power is similarly implied from his duty to conduct the nation's foreign affairs. Although direct threats to the existence of governmental institutions or to territorial integrity are of immeasurable gravity, there would seem to be nothing in the language of the Constitution to justify completely removing the Fourth Amendment's requirements in the foreign affairs field and, concurrently, imposing those requirements in all other situations.

In *United States District Court*, the Supreme Court refused to forego traditional Fourth Amendment analysis despite the government's claim that a warrantless surveillance of a domestic organization believed by the Executive to represent a threat to national security did not overstep the bounds of the Fourth Amendment. The Court implicitly rejected the contention that the existence of the Executive's belief that national security was involved somehow rendered the requirements of the Fourth Amendment inoperative. It went on to hold that the government must secure a warrant before conducting the type of surveillances at issue therein.[41]

▉ Thus, we conclude, as Judge Gibbons does, that the Fourth Amendment is also applicable where, as here, the President is acting pursuant to his foreign affairs duties even though the object of the surveillance is not a domestic political organization. Our differences with Judge Gibbons' opinion center primarily on the necessity for *prior* judicial authorization under the circumstances of this case.

---

37. 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

38. U.S.Const. Art. II, § 1.

39. The hypothetical postulated by Judge Gibbons, *see* p. 628 *infra*, may well fall within the ambit of United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). *See* p. 608 *infra*.

40. Although, it seems that Justice Sutherland, the writer of the Supreme Court's opinion in *Curtiss-Wright*, did not agree that the foreign affairs power of the federal government was founded on a constitutional grant, Justice Sutherland's position has recently been challenged by Professor Lofgren on historical grounds. Professor Lofgren also contends that the Court has not yet read *Curtiss-Wright* as embodying the philosophy apparently espoused by Justice Sutherland. See Lofgren, United States v. Curtiss-Wright Export Corporation: An Historical Reassessment, 83 Yale L.J. 1 (1973).

41. In *United States District Court*, the Supreme Court specifically stated that the case did not present questions relating to the foreign affairs powers of the Executive: "Further, the instant case requires no judgment on the scope of the President's surveillance power with respect to the activities of foreign powers within or without this country." 407 U.S. at 308, 92 S.Ct. at 2132.

## 2. *The Provisions of the Fourth Amendment.*

■ Assuming then that the Fourth Amendment is applicable,[42] we must now examine the requirements of that provision. The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The two substantive clauses of the amendment possess independent significance. First, all searches and seizures, even if authorized by warrant, must be reasonable.[43] At a minimum, this means that some form of probable cause for the search and seizure must exist. Second, even a reasonable search may be unlawful if the official fails to secure a warrant. "We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." [44]

Here a search warrant was not secured prior to the surveillances. We must therefore, determine whether this fact, in and of itself, renders the wiretaps repugnant to the Fourth Amendment. Since, as will be shown, we are unable to conclude that the absence of a search warrant under these circumstances is fatal, we must then otherwise evaluate the reasonableness of the infringement of Ivanov's privacy.

### a. *The Warrant Requirement.*

The exceptions to the warrant requirement represent cautious reponses on the part of the Supreme Court to specific and exigent factual situations. Thus, an automobile may be searched without a warrant to prevent the transfer of contraband to another locality when there is insufficient opportunity to obtain a warrant.[45] An officer may search a person without a warrant incident to a lawful arrest or when he has probable cause to arrest in order to avert possible destruction of evidence or when there is a possibility of an attempt to use a concealed weapon to injure the officer or facilitate escape.[46] In other circumstances, even though probable cause to arrest may not exist, an officer

42. The electronic surveillances at issue here occurred prior to the Supreme Court's decision in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), but "the Government does not rely on pre-Katz law . . . ." 318 F.Supp. 66, 70 (1970). *Katz* overturned the earlier rule that the Fourth Amendment did not extend to electronic surveillance unless there was a technical trespass. *See, e.g.,* Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Thus, the government's posture obviates the need to review the procedure by which the surveillance devices were installed.

43. Go-Bart Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931). *See* Spritzer, Electronic Surveillance by leave of the Magistrate: The Case in Opposition, 118 U.Pa.L.Rev. 199, 181 (1969).

44. McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948). "The requirement of a warrant to seize im-

poses no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable,' in the absence of 'exigent circumstances.'" Coolidge v. New Hampshire, 403 U.S. 443, 470–471 (1971).

"[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." Camara v. Municipal Court, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

45. *E. g.,* Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

46. *E. g.,* United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); Cupp v. Murphy, 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969).

may "frisk" a person he has properly detained for questioning if he believes that the person may be armed and dangerous.[47]

The Court has also narrowed the ambit of the Fourth Amendment warrant requirement where the intrusion is a "home visit" by a welfare worker.[48] Several considerations—the rehabilitative aspects of the visit, the noncriminal nature of the investigation, and the strong state interest in having an efficient administrative procedure whose object is to promote the welfare of the children of assistance recipients—combined to lead to the conclusion that the warrantless intrusion. if viewed as a search, is not subject to the warrant requirement.[49]

While we acknowledge that requiring prior approval of electronic surveillance in cases like the present one might have some salutary effects—a judge, for example, could assure that the Executive was not using the cloak of foreign intelligence information gathering to engage in indiscriminate surveillance of domestic political organizations [50]—on balance, the better course is to rely, at least in the first instance, on the good faith of the Executive and the sanctions for illegal surveillances incident to post-search criminal or civil litigation. One of the elements that prompted the Supreme Court to dispense with the warrant requirement in the "home visit" situation was the strong public interest involved. In the present case, too, a strong public interest exists: the efficient operation of the Executive's foreign policy-making apparatus depends on a continuous flow of information.[51] A court should be wary of interfering with this flow.

It would be unfortunate indeed if, as Judge Gibbons seems to suggest, the President must act illegally to perform his constitutional duties. Yet, if the President must act secretly and quickly to investigate an attempt by a foreign agent to obtain important intelligence information, such a result may follow under Judge Gibbons' analysis. Also, foreign intelligence gathering is a clandestine and highly unstructured activity, and the need for electronic surveillance often cannot be anticipated in advance. Certainly occasions arise when officers, acting under the President's authority, are seeking foreign intelligence information, where exigent circumstances would excuse a warrant. To demand that such officers be so sensitive to the nuances of complex situations that they must interrupt their activities and rush to the nearest available magistrate to seek a warrant would seriously fetter the Executive in the performance of his foreign affairs duties.

█ In sum, we hold that, in the circumstances of this case, prior judicial authorization was not required since the district court found that the surveillances of Ivanov were "conducted and maintained solely for the purpose of gathering foreign intelligence information."

### b. *The probable cause requirement*

Although, as we have held, a warrant prior to search is not an absolute prerequisite in the foreign intelligence field when the President has authorized sur-

47. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

48. Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971).

49. *See also* United States v. Slocum, 464 F.2d 1180 (3d Cir. 1972) (warrantless use of magnometer and warrantless search of hand luggage of airline passenger in some circumstances are not unconstitutional).

50. *See* United States v. United States District Court, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

51. The surveillance in this case, of course, seems to have been designed to impair the escape to foreign powers of sensitive information concerning the foreign policy and military posture of the United States. We see no reason to distinguish this activity from the foreign intelligence gathering activity. *See* 18 U.S.C. § 2511(3).

veillance, a judge will be called upon, in some instances, to ascertain the legality of a warrantless search already conducted.[52] The opportunity for post-search judicial review represents an important safeguard of Fourth Amendment rights and should deter abuse that might be caused by the necessary relaxation of the warrant requirement.

 The foundation of any determination of reasonableness, the crucial test of legality under the Fourth Amendment, is the probable cause standard.[53] Although most often formulated in terms of an officer's probable cause to believe that criminal activity has or will take place, the standard may be modified when the government interest compels an intrusion based on something other than a reasonable belief of criminal activity, especially when the scope of the intrusion is limited.[54]

██ The government interest here —to acquire the information necessary to exercise an informed judgment in foreign affairs—is surely weighty. Moreover, officers conceivably undertake certain electronic surveillance with no suspicion that a criminal activity may be discovered. Thus, a demand that they show that before engaging in such surveillance they had a reasonable belief that criminal activity would be unearthed would be to ignore the overriding object of the intrusions. Since the primary purpose of these searches is to secure foreign intelligence information, a judge, when reviewing a particular search must, above all, be assured that this was in fact its primary purpose and that the accumulation of evidence of criminal activity was incidental. If the court, for example, finds that members of a domestic political organization were the subjects of wiretaps or that the agents were looking for evidence of criminal conduct unrelated to the foreign affairs needs of a President, then he would undoubtedly hold the surveillances to be illegal and take appropriate measures.

██ Since, we reiterate, the district court has found that the second set of interceptions of conversations of Ivanov were "solely for the purpose of gathering foreign intelligence information," they are reasonable under the Fourth Amendment. Because we have already concluded that a warrant was not required under the circumstances here, we, therefore, hold that Ivanov's Fourth Amendment rights were not violated.[55]

52. A court must examine the legality of a search, for example, when a defendant in a criminal case moves to suppress evidence produced by the search or when the plaintiff in a civil suit bases his request for damage relief against federal officers on the alleged illegality of a search of his person or home. *See* note 21 *supra*.

53. Camara v. Municipal Court, 387 U.S. 523, 534, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). However, a search based upon probable cause may not comport with the Fourth Amendment if, for example, its scope is unreasonably broad. *See* Terry v. Ohio, 392 U.S. 1, 18, 88 S.Ct. 868, 20 L.Ed.2d 889 (1968).

54. Adams v. William, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ; Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed. 2d 408 (1971) ; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ; Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

55. 18 U.S.C. § 3504(a)(2), a portion of the Organized Crime Control Act of 1970, provides in relevant part as follows:

(a) In any trial, hearing or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

. . . . .

(2) disclosure of information for a determination if evidence is inadmissible because it is the primary product of an unlawful act occurring prior to June 19, 1968, or because it was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, shall not be required unless such information may be relevant to a pending claim of such inadmissibility; and

. . . . .

(b) As used in this section "unlawful act" means any act the use of any electronic, mechanical, or other device (as defined in section 2510(5) of this title) in

## IV. IN CAMERA EXAMINATION

The distinguished district court judge reviewed *in camera* the records of the wiretaps at issue here before holding the surveillances to be legal. If the surveillances had been found illegal, *Alderman*, of course, would have required disclosure of these records to Ivanov prior to an adversary hearing on the issue of taint. However, since the question confronting the district court as to the second set of interceptions was the legality of the taps, not the existence of tainted evidence, it was within his discretion to grant or to deny Ivanov's request for disclosure and a hearing. The exercise of this discretion is to be guided by an evaluation of the complexity of the factors to be considered by the court and by the likelihood that adversary presentation would substantially promote a more accurate decision.[56]

As stated, Ivanov does not challenge the finding of the district court that the "surveillances were conducted and maintained solely for the purpose of gathering foreign intelligence information." Nor does he contend that he was the object of surveillance because of domestic political activity or because of conduct unrelated to his own espionage concerns. Under these facts, we fail to see how disclosure of the records of the wiretaps and an evidentiary hearing would serve to shed further light on either the legal question involved in this appeal—whether the President has authority to conduct warrantless surveillances in the foreign affairs field—or its factual underpinnings—whether the surveillances at issue were, in fact, conducted pursuant to the President's foreign affairs authority.

Moreover, the nature of information contained in these records with respect to the relations of this nation with foreign powers counsels court-ordered disclosure only in the most compelling situations. Thus, we hold that the district court's failure to order disclosure of the records of the second set of interceptions or to hold a hearing regarding them did not constitute an abuse of discretion.

## V. CONCLUSION.

The present case raises issues concerning a clash of interests of highest concern to the vitality of this nation. As is typical under our system of government, the conundrum implicit in the controversy has been brought to the judiciary for authoritative resolution. Ivanov contends that the Communications Act should be construed to bar such surveillance and the use of material obtained thereby and that without prior judicial authorization the President and his counselors may not constitutionally intercept his telephone communications. The government asserts that the Com-

---

violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto.

It would appear that this provision becomes operative when evidence has been gathered by unlawful means. Since we have determined the searches herein to be lawful, this provision appears inapposite. We need not, therefore, discuss the effect of the intervening enactment of this provision on the Supreme Court's mandate in *Alderman*. Since Chief Judge Seitz and Judge Gibbons conclude that these surveillances were illegal, they, of course, do deal with this issue.

56. If we were to hold, as Judge Aldisert intimates, that under § 605 the surveillance is not illegal unless the interception, or the fruits thereof, has been introduced at trial, it would seem that disclosure would be required before a determination is made that the surveillance was, in fact, illegal. For the question whether the contents or the "fruits" of the interception had been divulged at trial appears quite similar to the question whether the contents or the "fruits" of an *illegal* surveillance have tainted a conviction. Ivanov would, undoubtedly, ask for disclosure of the records, claiming that he could not effectively probe, at the hearing, the issue whether the contents had been divulged. Under such an interpretation, the purport of *Alderman* would then seem to require that the district court grant Ivanov's request. Thus, under Judge Aldisert's construction of § 605, there would be disclosure of the records of the surveillances before such surveillances have been held to be illegal. *Cf.* Totten v. United States, 92 U.S. 105, 106–107, 23 L.Ed. 605 (1876).

municatíons Act should not be so construed and, with respect to the constitutional question, maintains that there is Presidential power to engage in warrantless surveillance to gather foreign intelligence information.

Principled adjudication of this knotty matter cannot properly be achieved by a doctrinaire preference for one interest or the other. Both executive authority in the foreign affairs area and society's interest in privacy are of significance, and are equally worthy of judicial concern.

Rarely, if ever, do the phrases of the Constitution themselves decide cases without at least some interpretative assistance from the judiciary. The Constitution speaks through the judges, but its phrases are seldom so cabined as to exclude all flexibility. Charged with the assignment to make a choice, a judge must be responsible for the choice he makes.

The importance of the President's responsibilities in the foreign affairs field requires the judicial branch to act with the utmost care when asked to place limitations on the President's powers in that area. As Commander-in-Chief, the President must guard the country from foreign aggression, sabotage, and espionage. Obligated to conduct this nation's foreign affairs, he must be aware of the posture of foreign nations toward the United States, the intelligence activities of foreign countries aimed at uncovering American secrets, and the policy positions of foreign states on a broad range of international issues.

To be sure, in the course of such wiretapping conversations of alien officials and agents, and perhaps of American citizens, will be overheard and to that extent, their privacy infringed. But the Fourth Amendment proscribes only "unreasonable" searches and seizures.[57]

And balanced against this country's self-defense needs, we cannot say that the district court erred in concluding that the electronic surveillance here did not trench upon Ivanov's Fourth Amendment rights.[58]

Accordingly, the judgment of the district court denying Ivanov's request for disclosure and an evidentiary hearing will be affirmed.

SEITZ, Chief Judge (concurring and dissenting).

I concur in affirming the district court's disposition of questions respecting the first, concededly illegal, set of surveillances. My views in this matter are well stated in Part II of Judge Aldisert's opinion.

As to the second set of surveillances, the majority has found that these wiretaps and their use to procure evidence introduced against Ivanov, assuming such use was made of them, violated neither § 605 of the Communications Act nor the Fourth Amendment. Finding the wiretaps legal, the majority has held that the district court properly refused to order disclosure to Ivanov of the logs summarizing these surveillances and that the court below also properly refused to hold an evidentiary hearing on the issue of taint. Because I believe that these matters are settled by Supreme Court decisions and that the majority in effect is "overruling" Supreme Court decisions, *sub silentio,* I dissent from the majority's affirmance of district court action respecting the second set of surveillances.

### I. § 605 OF THE COMMUNICATIONS ACT

As I read the majority opinion, two conclusions support its decision that § 605 of the Communications Act has not been violated here. First, in logical or-

---

57. United States v. Slocum, 464 F.2d 1180, 1182 (3d Cir. 1972).

58. Nearly 85 years ago, Mr. Justice Field, speaking for the Supreme Court, observed: "To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated." Chinese Exclusion Case, 130 U.S. 581, 606, 9 S.Ct. 623, 630, 32 L.Ed. 1068 (1889).

der, because wiretapping is "one means of acquiring information" that may make the President's decisions regarding foreign affairs "more likely to advance our national interests," the majority presumes that Congress did not limit the President's ability to wiretap to obtain foreign intelligence information when it adopted § 605 without explicit discussion of this use of wiretaps. Second, the majority declares that "[t]here is absolutely no indication that Congress contemplated situations where interceptions were unaccompanied by divulgences" and reasons that since Congress presumably did not intend to limit the President's use of wiretaps to stay informed regarding foreign affairs, § 605 is not violated by use of wiretap-derived evidence to secure espionage convictions. These conclusions, relied on for the majority's holding that § 605 has not been breached, do not follow from their premises and contradict Supreme Court precedent as well as the terms of § 605.

Initially, I think that insufficient attention has been paid to the section itself. Section 605 of the Communications Act, 47 U.S.C. § 605 (1970), contains four distinct prohibitions. The first prohibition is directed at employees of communications facilities and is not relevant here. Cf. Nardone v. United States, 302 U.S. 379, 381, 58 S.Ct. 275, 82 L.Ed. 314 (1937). The prohibition contained in the third clause of § 605 concerns unauthorized reception of communications; the second and fourth prohibitions concern interception. The Act does not define reception and interception, but, attributing to the drafters a desire that each statutory statement be meaningful and not merely repetitive, I would distinguish these terms by the point in time at which the unauthorized

participant acquires access to a communication; reception would occur following transmission, while interception would occur during transmission to and preceding reception of the communication by someone other than the interceptor. The third clause of § 605, therefore, also is inapplicable here.

### § 605: Clause 2, Element (1)

If the government has violated § 605, then, it must be by virtue of the section's second or fourth prohibition. The second part of § 605 forbids (1) any person not authorized by the sender (2) to intercept and (3) divulge or publish the communication's contents, meaning or existence (4) to any person.[1] This portion of § 605 was construed by the Supreme Court in Nardone v. United States, supra, which involved in-court testimony by federal agents as to the contents of communications intercepted by government wiretaps. The argument advanced by the government in Nardone bears a striking resemblance to the first argument accepted by the majority here. The government contended that the executive branch was charged to take care that the laws of the United States be faithfully executed, that Congress at the time it passed the Communications Act was aware of the government's use of wiretap evidence to faithfully execute federal criminal laws, that Congress did not mention this use of wiretaps in considering § 605 of the Communications Act, and that, therefore, Congress must be presumed to have excluded federal agents, acting in furtherance of their duty to enforce criminal laws, from those persons covered by § 605. Id. at 381–383, 58 S.Ct. 275.

The Court in Nardone observed that not only was there no discussion in

1. Section 605 is written as a single sentence composed of four separable sentences joined by semi-colons and a proviso, not relevant here, modifying the entire section. For ease of discussion, I have numbered the separable sentences, each constituting a self-contained prohibition of different actions, in the order set forth in the statute and also assigned numbers to the elements required for viola-

tion of each prohibition. The second prohibition reads:

 . . . and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; . . . .

47 U.S.C. § 605 (1970).

.adoption of § 605 of the use federal agents made of wiretaps, but there was no record of any legislative discussion concerning adoption of § 605. The Court further noted that several bills designed explicitly to prohibit government wiretapping had failed shortly before passage of the Communications Act. These circumstances, however, were insufficient to overcome "the fact that the plain words of § 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that *'no person'* shall divulge or publish the message or its substance to *'any person.'*" *Id.* at 382, 58 S.Ct. at 276 [emphasis in original]. In explaining its refusal in the absence of legislative history to speculate that Congress intended to exclude federal agents from the strictures of § 605, the Court added:

> It is urged that a construction be given the section which would exclude federal agents since it is improbable that Congress intended to hamper and impede the activities of the government in the detection and punishment of crime. The answer is that . . . Congress may have thought it less important that some offenders go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty.

*Id.* at 383, 58 S.Ct. at 276.

I am unable to see any difference between the argument rejected by the Supreme Court in *Nardone* and that accepted by the majority here. Both argue that the plain all-inclusive language of the statute covering any person should be construed not to apply to federal officers performing tasks assigned by the Constitution to the executive branch. Both rely on the absence of legislative history, and both would require explicit legislative consideration of a limitation on the executive's freedom of action before a statute could be read to restrict it. The canons of statutory construction considered by the Supreme Court in

*Nardone, id.* at 383, 58 S.Ct. 275, apply with equal force in both cases.

There is of course a distinction between this case and *Nardone*. The case before us, as cast by the majority, involves Presidential powers over foreign affairs, while *Nardone* concerned executive authority over domestic matters. This distinction, however, makes no legal difference. The only constitutional provision cited by the majority as authority for the executive decision-making that "foreign intelligence information" supposedly aids is Article II, section 2's declaration that "[t]he President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States . . . ." This provision certainly cannot be said to be any more important than Article II, section 3's charge that the President "take care that the Laws be faithfully executed," nor can wiretapping be deemed any more crucial to accomplishment of the President's duties as Commander-in-Chief than to his faithful execution of the laws.

The majority, however, apparently attaches significance to the fact that the President has powers over foreign affairs that are not made express in the Constitution. The majority's principal authority as to this point is United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), decided one year before *Nardone*. *Curtiss-Wright* stated that the federal government possessed certain powers over foreign affairs inherent in national sovereignty. *Id.* at 318, 57 S. Ct. 216. In upholding a statute permitting the President to make certain decisions bearing on foreign affairs against a charge of unconstitutional delegation of legislative power, the Court observed that power over foreign affairs was not legislative alone. *Id.* at 319–322, 57 S. Ct. 216. While rejecting the statement in Curtis-Wright that certain foreign affairs powers inhere in national sovereignty, constitutional considerations

aside, (see note 37 of the majority opinion), the majority here relies on *Curtiss-Wright* for the proposition that foreign affairs powers may be implied in the Constitution even if federal powers over domestic affairs must be express. Yet, the majority never explains why this nebulous federal implied power, even assuming that it is addressed solely to the executive, is entitled to greater deference than an express power of the executive such as *Nardone* involved.

Perhaps the majority has concluded that Congress could not limit the President's power to wiretap in order to obtain foreign intelligence information.[2] Without explicitly stating this conclusion, the majority indicates that "any action by [Congress] that arguably would hamper . . . the President's effective performance of his duties in the foreign affairs field would have raised constitutional questions." The majority does not cite any precedent supporting this statement, nor does it state what questions would be raised. As I read Articles I and II of the Constitution, the Congress as well as the President has powers in foreign affairs. Congress is empowered to regulate commerce with foreign nations, to define and punish crimes committed on the high seas and offenses against the law of nations, to declare war, to raise and support armies, provide and maintain a navy, to provide for calling forth the militia to repel invasions, and to make rules for governing the armed forces. The President's powers in the foreign affairs area, independent of legislative delegations, are far more limited: he is Commander-in-Chief of the armed forces and receives public ministers; he can make treaties, with the Senate's concurrence, and appoint ambassadors, again with Senate approval.

The President is certainly no "Lone Ranger" in the foreign affairs field, possessed, as the majority intimates, of vast constitutional powers to be exercised independently of Congress. All of the federal government's powers, including foreign affairs powers, are subject to constitutional limitations, United States v. Curtiss-Wright Export Corp., *supra*, 299 U.S. at 320, 57 S.Ct. 216, and one such limitation on the President's power is the exercise of Congressional power. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637–638, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (1952) (Jackson, J., concurring) [footnote omitted].

I cannot conceive of any power in the foreign affairs field that the President exercises exclusively and for which wiretapping is essential; I cannot perceive any legal basis for intimating that Congress could not constitutionally limit the President's power to wiretap to obtain "foreign intelligence information." Apparently, Judge Learned Hand was of the same view, as were the judges concurring in his opinion in United States v. Coplon, 185 F.2d 629 (2d Cir. 1950). *Coplon* was, like this case, an espionage case involving the possible use of wiretap fruits. As the majority notes,

---

2. While the majority has added a disclaimer of this conclusion, the intimation that such a conclusion might fairly be reached is essential to the majority's position. If Congress can limit executive actions useful to foreign affairs operations, there is no basis for dis-

tinguishing *Nardone* from this case. *Nardone* certainly does not reflect fear of reading § 605 to mean what it says because such a reading would raise constitutional questions—yet the Court clearly allowed Congressional restriction of executive action.

Judge Hand engaged in no lengthy discussion to distinguish foreign intelligence wiretaps from others. It is safe to assume that Judge Hand knew that "foreign intelligence" was probably sought in wiretapping that led to an espionage charge. One may also assume that the government did not argue that Congressional limitation of foreign affairs wiretapping was constitutionally different from limitation of other government wiretapping—indeed, the government has not raised the argument in this case. Instead of inquiring into the constitutionality of the law, which, if he had doubted the Act's constitutionality, he would have been required to do, Marbury v. Madison, 5 U.S. (1 Cranch) 137, 175–180, 2 L.Ed. 60 (1803), Judge Hand declared that the validity of the *Coplon* wiretap was covered by the ruling in *Nardone*. United States v. Coplon, *supra*, 185 F.2d at 636.

Like Judge Hand, I can see no basis for distinguishing *Coplon* from *Nardone*, nor can I distinguish this case from those. Thus, perceiving no difference between this case and *Nardone*, I would find that the federal agents involved here fall within the category of persons described in the first element of § 605's second clause.

### § 605: Clause 2, Elements (3) & (4)

The government does not dispute that it falls within the second element of § 605's second prohibition; federal agents did intercept communications involving Ivanov. The government contends, however, that federal agents did not divulge the communication's contents to any other person, the third and fourth elements required for violation of § 605, clause two. Of course the agents who made the interception divulged the "existence, contents, substance, purport, effect, or meaning" of the intercepted communication to other agents. Perhaps, as Judge Aldisert implies, such divulgence does not violate § 605 because the federal officers are really acting as agents of the executive in making the interception and the relevant "person" to be viewed as interceptor is, thus, the executive; divulgence to other agents of the executive, who receive the information in such capacity, hence would not violate the statute because the "divulgees" would be part of the same "person" as the "divulgors." Cf. 47 U.S.C. § 153(i) (1970) (defining "person" to include, as well as individuals, partnerships, associations, trusts and corporations).

I do not think that question needs to be resolved here. Ivanov argues that the relevant divulgence occurred at trial when the government introduced evidence obtained by use of the wiretaps. The Supreme Court's first *Nardone* decision held that the government could not introduce testimony on the content of wiretaps. The second *Nardone* decision, Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), held that the fruits of the interception also could not be introduced. *Id.* at 340–341, 60 S.Ct. 266. Assuming that the Court was again dealing with the second prohibition contained in § 605, I would read *Nardone II* as holding that the use of a wiretap's fruits in court constituted a divulgence prohibited by § 605.

### § 605: Clause 4

While the precise ground for the *Nardone II* decision is not clear to me, the illegality of any derivative evidentiary use of wiretaps is. This illegality becomes more apparent on examination of the final prohibition contained in § 605. The section's last clause forbids (1) any person who has received or become aware of the existence, meaning or contents of a communication (2) intercepted without the sender's authorization (3) from divulging, publishing *or using* such information (4) for his own benefit or the benefit of another unauthorized person.[3]

3. The fourth prohibition provides:
 . . . and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that

This clause expressly prohibits the use of wiretap information.

The only remarks Supreme Court justices have made referring expressly to this clause are contained in the dissent to Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942). The majority in *Goldstein* decided that defendants who were not parties to the communication lacked standing to object to introduction of wiretap fruits against them. *Id.* at 121–122, 62 S.Ct. 1000. In dissent, Justice Murphy, joined by Chief Justice Stone, who voted with the majorities in *Nardone I* and *II,* and Justice Frankfurter, who authored *Nardone II,* disagreed with the Court on standing and thus reached the merits. The dissenters found this fourth part of § 605 to be "unequivocal and controlling." 316 U.S. at 125–126, 62 S.Ct. 1000. "In enacting § 605, Congress sought to protect society at large against the evils of wiretapping and kindred unauthorized intrusions into private intercourse conducted by means of the modern media of communication, telephone, telegraph, and radio. To that end the statute prohibits not only the interception and the divulgence of private messages without the consent of the sender, but also the use of information so acquired by any person not entitled to it." *Id.* at 125, 62 S.Ct. at 1006. I would, therefore, find that § 605 prohibits use of wiretap information to obtain any evidence for trial.

### § 605: Hearing & Disclosure

Since the derivative use of wiretaps alleged by Ivanov is made illegal by § 605, the question of illegality becomes identical to the question of taint. The wiretap information must be disclosed to the defendant and a hearing must be held to resolve the issue of taint. Alderman v. United States, 394 U.S. 165, 183–185, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Nardone v. United States, 308 U.S. 338, 341–342, 60 S.Ct. 266, 84 L.Ed. 307 (1939); United States v. Coplon, *supra,* 185 F.2d at 636–640.

Since the decision in *Alderman,* the Congress has purportedly changed the method for determining taint from government wiretapping. The Organized Crime Control Act of 1970 provides, in relevant part, that taint from surveillances prior to the effective date of the Omnibus Crime Control and Safe Streets Act of 1968 shall be determined by disclosure and hearing only if an *in camera* proceeding convinces the judge that the surveillances are arguably relevant, 18 U.S.C. § 3504(a)(2) (1970), and that courts shall not consider claims that such surveillances have tainted the evidence of a crime occurring more than five years after the surveillance, 18 U.S.C. § 3504(a)(3) (1970). The bar to consideration of taint is inapplicable here since the relevant wiretaps occurred within two years of the acts sought to be proved,[4] allegedly with wiretap fruits. The question is presented, however, whether the 1970 Act's procedure for determining taint governs this case and, if so, whether it is constitutional.

Congress specifically provided that the 1970 Act applies to all proceedings, whenever commenced, after its effective date. Organized Crime Control Act of 1970, ch. 223, 84 Stat. 935, § 703. Congress also clearly intended to alter the procedure set forth in *Alderman* for determining taint from pre-1968 wiretaps. H.R.Rep.No.91–1549, in 1970 U.S. Code Cong. & Admin.News, pp. 4007, 4027. The precise question here, however, is whether Congress intended to change the rule of *Alderman* for the cases actually before the Court and as to evidence introduced, and to which objection was made, before passage of the 1970 Act.

such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect or meaning of the same or any part thereof, or use the same or any information contained therein for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605 (1970).

4. Letter of June 2, 1969 from Attorney General Mitchell.

The statute's wording would support restricting use of its procedure for determining taint to cases in which prospective admission of evidence was the subject of controversy; it applies "upon a claim by a party aggrieved that evidence is inadmissible . . . . " 18 U.S.C. § 3504(a)(1) (1970). Nothing I have found in the legislative history of the 1970 Act indicates that Congress intended the Act to apply to determinations, after its passage, on the propriety of the introduction of evidence before passage of the 1970 Act. While the statute as relevant here does not purport to change the propriety of admission of evidence, but rather changes only the method for determining admissibility, the *Alderman* Court recognized that the method of ascertaining taint may well determine whether evidence is admitted or excluded. See Alderman v. United States, *supra*, 394 U.S. at 183–185, 89 S.Ct. 961.

Not only do I find limitation of the 1970 Act to questions of introduction of evidence after the Act's effective date plausible, but also I find such construction necessary to avoid serious doubt as to the statute's constitutionality. I cannot dismiss United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), as a case dealing solely with the Supreme Court's right to determine the effect of a presidential pardon. *Klein* involved three questions concerning the effect of Congressional enactments. The first question was the effect of an 1867 statute on the President's pardon powers. *Id.* at 141–142. The second question was the effect of an 1870 statute on the Supreme Court's jurisdiction. *Id.* at 143–148. The final question was the effect of the 1870 act's provisions prescribing the evidence that could be relied upon for certain findings and the result required on the basis of other findings. *Id.* The Court of Claims had, in 1869, rendered a decision in Klein's favor, giving effect to the President's grant of pardon and amnesty and using evidence proscribed by the 1870 act. The Supreme Court held that the 1867

statute did not impair the President's pardon powers, and that the 1870 act neither divested the Supreme Court of jurisdiction acquired before the act's passage nor required the Court to reverse the Court of Claims decision in accordance with the statute's directive regarding the admission and effect of evidence. *Id.* I believe that *Klein* is apposite to and casts doubt upon the constitutionality of applying the 1970 Act to Ivanov. Because I feel that the intent of Congress that the 1970 Act apply here is not made clear by the statute's language or history and that the application of the statute to this case might not be constitutional, I would find that the 1970 Act is inapplicable to this proceeding.

## II. SCOPE OF SUPREME COURT MANDATE

In suggesting disposition on § 605 grounds, I must comment on a point raised by the government for the first time in its petition for rehearing but not reached by the majority. When this case was before the Supreme Court, the Solicitor General revealed that conversations involving Ivanov had been overheard through wiretaps. The question of a possible § 605 violation was not raised at that time. The Supreme Court thus addressed the matter as if only a potential Fourth Amendment violation were involved. Consequently, in remanding the case to the district court, the Supreme Court directed that "[t]he District Court should confine the evidence presented by both sides to that which is material to the question of the possible violation of a petitioner's Fourth Amendment rights, to the content of conversations illegally overheard which violated those rights and to the relevance of such conversations to the petitioner's subsequent conviction." Alderman v. United States, *supra*, 394 U.S. at 186, 89 S.Ct. at 973. After arguing before the district court the validity of government action under § 605, the government now urges that only Fourth Amendment questions could be reached

on remand consistent with the Supreme Court's mandate.[5]

The Supreme Court has stated that "[w]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." Sprague v. Ticonic National Bank, 307 U.S. 161, 168, 59 S.Ct. 777, 781, 83 L.Ed. 1184 (1939). Such matters are open unless their "disposition . . . by the mandate . . . was necessarily implied in the claim in the original suit, and [the party's failure to raise them constituted] an implied waiver." Id. Since the § 605 issue was not raised prior to the remand, it was not necessarily disposed of by the Supreme Court mandate; and since the possibility of § 605 violation was not known to Ivanov at the time of his petition to the Court, his failure to raise the issue prior to remand cannot be deemed implied waiver. The obvious intent of the Supreme Court in framing its mandate was to limit proceedings on remand to issues connected with the government's wiretapping. The legality of government action under § 605 is certainly such an issue.

Finding that the case should be disposed of on § 605 grounds, I would not reach the Fourth Amendment issues.

Judge Van Dusen joins in this opinion.

Judge Aldisert joins in this opinion except the discussion contained in the section headed "§ 605: Clause 2, Element (1)."

ALDISERT, Circuit Judge (concurring and dissenting.)

I would reverse the final judgment of conviction and remand these proceedings to the district court for reconsideration. Assuming without conceding a constitutional prerogative of the Chief Executive to intercept, I am persuaded that the strictures of § 605 of the Communications Act of 1934, as interpreted by the Court in Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937), prevents divulging or publishing the contents of the interception. My view coincides precisely with that taken by the Department of Justice under Attorneys General Tom C. Clark, J. Howard McGrath, Herbert Brownell, Jr., William P. Rogers and Robert F. Kennedy.

I.

Before proceeding into a discussion of this issue in part III, infra, I am constrained to set forth additional observations to present in detail the equally important issue upon which the panel of this court was not divided and upon which there appears to be unanimity in the full court: the district court's holding that the first set of logs, designated as "4001–S*" and "4002–S*" did not taint the conviction. To put these issues in proper perspective I find it necessary to set forth the facts.

Appellant Igor Ivanov, a Soviet national, was charged with having conspired with one John Butenko, an American, to violate the federal espionage statute, 18 U.S.C. § 794(a) and (c)[1]

---

5. It appears that the government not only argued the § 605 question before the district court without indicating that this matter might be beyond the scope of the Supreme Court's mandate, but further, the government apparently raised the matter of legality under § 605. Even if this question were arguably beyond the scope of the Supreme Court's mandate, there is some question whether the government would be estopped from arguing this question here.

1. The relevant subsections of 18 U.S.C. § 794, "Gathering or delivering defense information to aid foreign government," read as follows:

(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject or citizen thereof, either directly or

(Count I), from April to October in 1963, and with having conspired to violate the statutory prohibition against acting as an agent of a foreign government without prior notification to the Secretary of State, 18 U.S.C. § 951[2] (Count II). Following a jury verdict of guilty, appellant Ivanov was sentenced to twenty years' imprisonment on Count I and five years' imprisonment on Count II, the sentences to run concurrently. This court affirmed the judgment of conviction against him on Count I and directed his acquittal on Count II. United States v. Butenko, 384 F.2d 554 (3d Cir. 1967). Appellant then filed petitions for certiorari in the United States Supreme Court. While the cases were there pending, the Solicitor General revealed that the United States had engaged in certain electronic surveillances and that Butenko and Ivanov had been overheard. The Supreme Court ordered a remand to the district court for "a hearing, findings, and conclusions (1) on the question of whether with respect to any petitioner there was electronic surveillance which violated his Fourth Amendment rights, and (2) if there was such surveillance with respect to any petitioner, on the nature and relevance to his conviction of any conversations which may have been overheard through that surveillance." [3] Alderman v. United States, 394 U.S. 165, 186–187, 89 S.Ct. 961, 973, 22 L.Ed.2d 176 (1969).

On remand, the government conceded that one set of interceptions was illegal but convinced the district court that these did not taint the conviction. The district court found a second set of interceptions to have been properly authorized by virtue of the President's prerogative to obtain foreign intelligence information, denied appellant's application for disclosure, denied an evidentiary hearing pertaining thereto, and entered a new judgment of conviction. United States v. Ivanov, 342 F.Supp. 928 (D.N.J.1972). This appeal followed.

The precise nature of the espionage conspiracy was a scheme to transmit to the Union of Soviet Socialist Republics the plan of a command and control system of the Strategic Air Command (SAC). Given the name "465–L," the system was being produced by International Electronic Company, a subsidiary of International Telephone and Telegraph, and was an automatic electronic system which enabled the commander of

---

indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.

(c) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy.

2. Whoever, other than a diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government without prior notification to the Secretary of State, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

3. The Court also ordered:
 The District Court should confine the evidence presented by both sides to that which is material to the question of the possible violation of a petitioner's Fourth Amendment rights, to the content of conversations illegally overheard by surveillance which violated those rights and to the relevance of such conversations to the petitioner's subsequent conviction. The District Court will make such findings of fact on those questions as may be appropriate in light of the further evidence and of the entire existing record. If the District Court decides on the basis of such findings (1) that there was electronic surveillance with respect to one or more petitioners but not any which violated the Fourth Amendment, or (2) that although there was a surveillance in violation of one or more of the petitioner's Fourth Amendment rights, the conviction of such petitioner was not tainted by the use of evidence so obtained, it will enter new final judgments of conviction based on the existing record as supplemented by its further findings, thereby preserving to all affected parties the right to seek further appropriate appellate review.

SAC to alert and deploy his forces and provide him with an up to the minute status of the total force. Additional details on the nature of this project are summarized in our earlier opinion. 384 F.2d at 557. We found that "there was substantial evidence to buttress the conviction" of Butenko, then employed as a control administrator at the International Electronic Company, and that "sufficient evidence was offered by the government to show [Ivanov's] intimate involvement with the conspiracy." 384 F.2d at 563.

At trial the government proved that on October 29, 1963, appellant was observed in Englewood, New Jersey, with two other Soviet Nationals, Pavlov and Romashin, in the vicinity of the Englewood railroad station parking lot. An automobile "driven by Butenko, drove into the railroad station lot, parked, turned off the headlights and turned on the parking lights and within a few minutes the Soviet automobile, now driven by Pavlov with Ivanov in the right front seat, came into the parking lot, signaled by turning off headlights and turning on parking lights. Here, there was a direct confrontation between Ivanov and Butenko and several minutes later, when the defendants were arrested, the briefcase of Butenko was found in the Soviet automobile." 384 F.2d at 563–564.

Two sets of logs reflecting electronic surveillances were introduced at the remand hearing and form the backdrop of this appeal. The first set covered the periods from May 15, 1963, to June 11, 1963, and from June 27, 1963, to August 13, 1963, and were designated as "4001–S\*" and "4002–S\*." These logs were disclosed to appellant. The government conceded that these logs represented illegal surveillances but contended that their use did not taint the conviction. The district court agreed. A second set of logs was not shown to appellant or his counsel but was examined by the court *in camera*. The government represented that these logs reflected intercepted conversations of Ivanov, duly obtained by the Department of Justice in the exercise of the President's right to obtain foreign intelligence information. These sealed documents, government exhibits A–1, A–2, and A–3, were accompanied by an affidavit of Attorney General John N. Mitchell setting forth the circumstances of, and authority for, the surveillance. The court ruled that this second set of logs was lawfully obtained under the theory set forth by the Attorney General and refused Ivanov the opportunity of examining them or an evidentiary hearing relating thereto.

Ivanov mounted separate arguments relating to each set of logs. He contended that the first set of logs was incomplete and, therefore, the court erred in its ruling that the use of these illegal surveillances did not taint the conviction. Secondly, he argued that the use of the surveillance evidence from the second set of logs was illegal, contravening Section 605 of the Communications Act of 1934,[4] or, alternatively, that use

---

4. 47 U.S.C. § 605. Unauthorized publication or use of communications

No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpena (sic) issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the bene-

of this evidence by the prosecution violated Fourth Amendment protections guaranteed him as an alien. See Au Yi Lau v. United States Immigration & Naturalization Service, 144 U.S.App.D. C. 147, 445 F.2d 217, 223, cert. denied, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971), stating that aliens in this country, like citizens, are protected by the Fourth Amendment. See generally Kwong Hai Chew v. Colding, 344 U.S. 590, 596–597, 73 S.Ct. 472, 97 L.Ed. 576 (1953).

## II.

Some factual background to the first set of logs is necessary. The actual tapes were not available; only logs reflecting a summary of their contents were presented. Government witnesses testified that it was standard practice to erase tapes which were not productive of meaningful evidence or leads, and because these surveillances were unproductive, the taped interceptions were not preserved. The court found as a fact: "Rarely did intelligible adult conversations come through, and no clear conversation of Ivanov was received over the equipment." 342 F.Supp. at 933. Using the test of United States v. Delerme, 457 F.2d 156 (3d Cir. 1972), I believe there is substantial evidence to support this finding.[5]

Typical of the testimony adduced at the hearing was that of Agent McWilliams who supervised the wiretapping. The district court reported: "McWilliams admitted that the electron-

ic surveillance of Ivanov conducted under his supervision produced no evidence that would have warranted Ivanov's arrest for engaging in any unlawful activity." *Id.* Agents McWilliams, Martin, Conway and Manning testified that no use was made of the results of those surveillances and no reports were furnished pertaining to their contents. The Assistant United States Attorney who prosecuted the case and the two Department of Justice agents who assisted him testified that they were unaware of any electronic surveillance.

Indeed, the district court observed throughout its opinion:

The evidence adduced at the hearing conclusively shows that Ivanov's conviction was not in any way tainted by reason of the unlawful electronic surveillances conducted by the Government.

342 F.Supp. at 931.

There is no question in the Court's mind, based on personal knowledge of the trial, and a careful review of the evidence adduced at the taint hearing, that the arrest and subsequent conviction of Ivanov resulted from the Government's independent investigation of the case, in which electronic surveillances 4001–S* and 4002–S* played no part.

342 F.Supp. at 936.

The electronic surveillances in this case were ineffective and unsuccessful. What they produced was, at best, innocuous, even when viewed by the

---

fit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided,* That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broad-

cast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress. June 19, 1934, c. 652, Title VI, § 605, 48 Stat. 1103.

5. In *Delerme,* we drew a distinction between review of historical or narrative facts in a criminal proceeding, and review of facts critical to the ultimate factual question of guilt. In the former case, this court will employ the clearly erroneous rule, while in the latter, we must determine whether there was substantial supportive evidence. Even applying the substantial evidence test, I would not disturb this finding.

specially trained and experienced FBI Agents. An examination of the logs, reflecting summaries of the surveillance tapes, reveals nothing more than a history of small talk and unintelligible chatter of such obvious insignificance that the FBI discontinued its electronic surveillance of Ivanov on June 18, 1963, because of its demonstrated consistent showing of non-productivity.

342 F.Supp. at 937.

The Court finds no specific evidence of taint in this case. Even assuming, *arguendo,* that some such evidence existed, the Court is satisfied beyond a reasonable doubt that in this case the Government has met its ultimate burden of showing that no substantial or measurable portion of the evidence used against Ivanov at his trial was tainted.

342 F.Supp. at 939.

Finally, Ivanov mounted a somewhat technical argument relating to the May 26 and May 27 surveillances. The government contended that the logs for these dates were before the district court. Appellant claimed that these were not the logs for May 26 and May 27, but rather, the logs for May 21 and May 22. The opinion of the court admits the date is unclear, and states concerning one log, it "could be either May 21 or May 26," and concerning the other, "the date appearing on C–6–2 could be read as either May 22, or May 27, 1963." 342 F.Supp. at 940.

From this Ivanov argued that the logs for May 26 and May 27 were destroyed or lost, and that these logs contained exculpatory or contradictory evidence. Additionally, he continued, if the logs for May 26 and May 27 were missing, there existed a possibility that evidence admitted at trial was the product of leads obtained from, and therefore tainted by, the illegal May 26 and May 27 surveillances; that is, because these logs were not before the court, there could be no finding that any of the government evidence was derived from legitimate independent sources.

As the district court's opinion demonstrates, these conclusions do not follow. One log was compiled for each day. There were ten days in May in the twenties—May 20 through May 29. There were ten logs for this period. "While there may be some question as to which log is which, the Court is satisfied that all logs covering the period May 20 through May 29, 1963, were in Court and in the possession of Ivanov's counsel, and further that no logs covering the period in question were missing, lost or destroyed." 342 F.Supp. 940. This is a finding of fact by the district court and I will not disturb it. United States v. Delerme, *supra.*

Moreover, my own independent scrutiny of these logs permits me to be more specific in my findings concerning these exhibits. Preliminarily, I observe that this court may examine documents and exhibits, which were before the district court and make its own independent determinations concerning them. See, *e. g.,* Shiya v. National Committee of Gibran, 381 F.2d 602 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 778, 19 L.Ed.2d 842 (1968).

There is no dispute concerning the dating of the 4001–S* logs. This set presents ten log sheets, one for each day from May 20 through May 29, 1963, all clearly dated. Also, there is only one log sheet for each day for each of the two surveillances. Because the log sheets for both surveillances were maintained by one agent, an entry on either log for the same date bears the same agent's initials. Of course, different agents were on duty at different times and on different dates.

With these facts as a basis, an examination of exhibits C–6–1 and C–6–2 reveals that appellant was correct in asserting that these two log sheets are for May 21 and May 22, respectively. Appellant introduced before the district court a full-page advertisement by NBC News in the May 21, 1963 issue of the

*New York Times,* announcing that the documentary film "The Kremlin" would be shown on Channel 4 from 9:30 to 10:30 that night. A log entry on exhibit C–6–1 shows that a television program entitled "The Kremlin" was overheard by electronic surveillance at 9:55 p. m. on the date of the log. Also, appellant introduced a *New York Times* television schedule for May 26, 1963, showing that "The Kremlin" was not scheduled for viewing at any time on that date. Moreover, a comparison of the agent's initials on exhibits C–6–1 and C–6–2, the log sheets in controversy, with the initials on the 4001–S* log sheets for May 21 and May 22, reveals that the initials and entries are identical. However, when compared with the agents' initials and entries on the 4001–S* log sheets for May 26 and May 27, there is no similarity. It is clear that exhibits C–6–1 and C–6–2 are log sheets for May 21 and May 22, 1963, respectively.

From this, however, it does not follow that the 4002–S* surveillance log sheets for May 26 and May 27 have been lost or destroyed. On the contrary, examination of exhibits C–8–1 and C–8–2 reveals that these sheets are the logs of surveillance 4002–S* for May 26 and May 27, respectively. First, an examination of exhibit C–8–1, ostensibly dated "5/21/63", reveals that the date on the log sheet previously read "5/26/63". The "6" was erased at some point and replaced with a "1", yet the "6" remains clearly visible underneath. Secondly, a comparison of the agents' entries and initials on exhibit C–8–1 with the 4001–S* log for May 26, discloses that they are identical. Thus, exhibit C–8–1 is the log sheet of surveillance 4002–S* for May 26, 1963.

Examination of exhibit C–8–2 reveals a similar change. This would appear to be the log sheet for "5/22/63". Upon closer examination, however, a "tail" can be seen to have been added to what was originally the "7" in "27" so as to make it a "2". Following this alteration, what was "5/27/63", became "5/22/63". Secondly, comparison of exhibit C–8–2

with the 4001–S* log sheet for May 27 yields a complete identity of the agents' entries and initials. Yet, when exhibits C–8–1 and C–8–2 are compared with the 4001–S* log sheets for May 21 and May 22, there is no similarity.

I have no basis for ascribing a sinister motive to the erasures and alterations.

Thus, I conclude (1) that exhibits C–6–1 and C–6–2 are the log sheets of surveillance 4002–S* for May 21 and May 22 respectively, and (2) that exhibits C–8–1 and C–8–2 are the log sheets of surveillance 4002–S* for May 26 and May 27, respectively.

These findings in no way conflict with those of the district court. Rather, these findings make specific that which the district court left general, and, as such, make them more definite and sustainable.

I conclude, therefore, that as to the first set of logs the district court discharged its responsibility properly under the Supreme Court's mandate. Confronted with a government concession that these surveillances were illegal, it had but one responsibility: to determine whether "the conviction of [the] petitioner was not tainted by the use of evidence so obtained." The district court found no such taint from the first set of logs and I find no error in this determination.

### III.

The second set of logs forms the background of the major issue in this appeal: whether the government could properly utilize in a criminal prosecution the product of an electronic surveillance obtained in 1963 solely on the strength of the Attorney General's position as the representative of the President in gathering foreign intelligence information.

At the outset, it is important to emphasize what is not before us. We are not interpreting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, June 19, 1968, 82 Stat. 212, 18 U.S.C. § 2510 et seq. Both the government and appellant agree that the governing statute at the

time of these interceptions was the Communications Act of 1934, 48 Stat. 1103; 47 U.S.C. § 605. Therefore, we are not called upon to consider the applicability of 18 U.S.C. § 2511(3).[6] Thus, I do not meet the issue reserved in United States v. United States District Court, 407 U.S. 297, 308, 92 S.Ct. 2125, 2132, 32 L.Ed. 2d 752 (1972): "Further, the instant case requires no judgment on the scope of the President's surveillance power [under Title III of the 1968 Act] with respect to the activities of foreign powers, within or without this country." Indeed, we are not required to define the parameters of the President's surveillance power under § 605. The limited nature of our inquiry is simply this: assuming a constitutional power of the President to have ordered surveillance of foreign agents in 1963, was it permissible for the government, under § 605 of the Communications Act of 1934, to utilize the products of such surveillance in a criminal prosecution?

That I so frame the question indicates that I avoid the invitation to plunge into an evaluation of Fourth Amendment considerations. I am mindful of Justice White's admonition "to [stop and] inquire whether the challenged interception was illegal under the statute" rather than proceed "directly to the constitutional issue without adverting to the time-honored rule that courts should abjure constitutional issues except where necessary to decision of the case before them. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346–348, 56 S. Ct. 466, 482–483, 80 L.Ed. 688 (1936) (concurring opinion)." United States v. United States District Court, *supra*, 407

U.S. at 340, 92 S.Ct. at 2148 (concurring opinion). Also, that I so frame the question and assume the constitutional power of the President in order to meet the statutory issue should not be interpreted as an agreement with the sweep of Judge Adams' discourse in Part III of the majority opinion. I simply do not meet this question.

I accept the hypothesis suggested by appellant that "it must be assumed that the conversations of Ivanov overheard on the wiretaps led to evidence used at his criminal trial." For the issue of taint could not be resolved against Ivanov without an evidentiary hearing. Alderman v. United States, and Ivanov v. United States, *supra*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176; Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968). Thus, I must assume "in the present posture of this case," as we did in In re Grand Jury Proceedings, Appeal of Sister Egan, 450 F.2d 199 (3d Cir. 1971), and as the Supreme Court did in Gelbard v. United States, and United States v. Egan, 408 U.S. 41, 92 S.Ct. 2357, 33 L. Ed.2d 179 (1972), that the government intercepted communications and utilized them in the proceedings against the appellant.

I am not without guidance in approaching this issue. The Supreme Court has ruled forcefully, specifically and in clear language free from any ambiguity, that § 605 was a complete and total bar to the admissibility of wiretap information obtained by federal agents in a smuggling prosecution. Interpreting the statutory language, " . . . 'no person not being authorized by the

6. (3) Nothing contained in this chapter or in section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U.S.C. 605) shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government. The contents of any wire or oral communication intercepted by authority of the President in the exercise of the foregoing powers may be received in evidence in any trial hearing, or other proceeding only where such interception was reasonable, and shall not be otherwise used or disclosed except as is necessary to implement that power.

sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person,'" the Court said:

> Taken at face value the phrase "no person" comprehends federal agents, and the ban on communication to "any person" bars testimony to the content of an intercepted message.

Nardone v. United States, 302 U.S. 379, 381, 58 S.Ct. 275, 276, 82 L.Ed. 314 (1937).

In the second *Nardone* case, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Court held that the statutory prohibition barred the evidentiary use of the fruits of the intercepted conversations, as well as the conversations themselves. The Supreme Court continued the absolutism of its pronouncements in review of a conviction for unlawful possession of alcoholic spirits in Benanti v. United States, 355 U.S. 96, 100, 78 S.Ct. 155, 157, 2 L.Ed.2d 126 (1957):

> The *Nardone* decisions laid down the underlying premises upon which is based all subsequent consideration of Section 605. The crux of those decisions is that the plain words of the statute created a prohibition against any persons violating the integrity of a system of telephonic communication and that evidence obtained in violation of this prohibition *may not be used to secure a federal conviction.* (Emphasis supplied.)

It is the government's contention that the President, acting through the Attorney General, may constitutionally authorize the use of electronic surveillance to obtain foreign intelligence information deemed essential to the security of the United States.[7] The government properly observes that Article II vests the President, as Chief Executive, with responsibility for the conduct of the nation's foreign affairs.

The district court accepted this contention, and solely for the purpose of this analysis, I shall assume that the district court did not err in this respect. However, accepting this contention does not put the matter to rest. The issue central to this case is not the constitutional power of the President to conduct such surveillances, but it is the less sophisticated question of admissibility of evidence in a criminal prosecution.

A review of the authorities relied upon by the government indicates that these cases failed to make the important distinction between the congressional power to forbid the disclosure of interceptions and the President's constitutional power to make interceptions.

It is beyond question that the President, as Chief Executive, possesses certain powers and responsibilities which are not dependent upon a specific legislative grant from Congress, but derive from the Constitution itself.[8] This principle was announced as early as Marbury v. Madison, 1 Cranch (5 U.S.) 137, 165–166, 2 L.Ed. 60 (1803):

> By the Constitution of the United States the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience.

United States v. Belmont, 301 U.S. 324, 328, 57 S.Ct. 758, 759, 81 L.Ed. 1134

---

7. The government suggests our reliance upon United States v. Dellinger, Crim. No. 60 CR 180 (Memorandum Opinion N.D. Ill. February 20, 1970) reversed on other grounds, 472 F.2d 340 (7th Cir. 1972); United States v. Clay, 430 F.2d 165 (5th Cir. 1970), reversed on other grounds, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971); United States v. Hoffman, 334 F.Supp. 504 (D.D.C. 1971); United States v. Enten, 329 F.Supp. 307 (D.D.C.1971); United States v. Brown, 317 F.Supp. 531 (E.D.La.1970).

8. See also, Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948); United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319–320, 57 S.Ct. 216, 81 L.Ed. 255 (1936); Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 890, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895).

(1937), held that "the conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this power [is] not subject to judicial inquiry or decision." [9]

It is also beyond cavil that Congress has the power to regulate the reception of evidence in federal courts. This was recently demonstrated when the President signed S. 583 under which the Rules of Evidence for United States Magistrates, amendments to the federal rules of civil and criminal procedure promulgated by the Supreme Court on November 20, 1972, will have no force or effect "except to the extent . . . as they may be expressly approved by Act of Congress." In Sablowsky v. United States, 101 F.2d 183, 189 (3d Cir. 1938), we said that *Nardone* "holds clearly that Section 605 creates a rule of evidence relating to the admission of intercepted wire communications sought to be divulged by officers of the United States in courts of the United States. No other interpretation can be placed upon this phase of the Nardone decision." [10] It remains only for us to determine whether it is consistent to assume that the President has the right to intercept and at the same time hold that the contents of the interception may not be divulged as evidence in a criminal prosecution. To resolve this we must turn to the language of the statute.

For my purposes the critical clause of § 605 is that which provides: "no person not being authorized by the sender shall intercept any communication *and* divulge or publish the existence, contents, substance, purport, effect, or

meaning of such intercepted communication to any person." (Emphasis supplied.) I emphasize that the Act states that no person shall "intercept any communication *and* divulge or publish." The conjunction "and" mandates the conclusion that two circumstances must occur for the bar of the statute to take effect: first, the interception, and, second, the divulging or publishing of the intercepted information "to any person." Thus, the Supreme Court has not construed this Act to make wiretapping an offense in all instances. Rather, it is the interception *and* disclosure of the contents of the message which constitute the crime. "Both acts are essential to complete the offense." United States v. Coplon, 91 F.Supp. 867, 871 (D.D.C. 1950), reversed on other grounds, 89 U. S.App.D.C. 103, 191 F.2d 749 (1951).

Under the theory of the presidential prerogative to gather foreign intelligence information, it is never contended that the President himself or his authorized Cabinet officer, performs the act of interception. This is done by special "agents" of a given department of the Executive Branch. Indeed, against the backdrop of the sophisticated interrelationships of a sprawling administrative b'ureaucracy, as required by the complexities of modern government, thousands of personnel within the Executive Branch are often considered as representatives of the person of the President. Five distinguished Attorneys General—with the scholarship and research at their command and a consummate desire to utilize the fruits of wiretaps as evidence in espionage prosecutions—concluded that Section 605 prevented the introduction of the evidence which is now permitted by the majority.

9. See also Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918) ; United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

10. The majority state that "§ 605 . . . does not, as Judge Aldisert urges, inexorably lead to the proposition that the statutory proscription against divulgence represented an evidentiary rule," thus creating the inference that I am urging a new theory in this court. Quite the contrary is true. I am

relying on case law which has been settled in this circuit since December 8, 1938, when this court, speaking through Judge Biggs, said: "[T]he provisions of the second and fourth clauses of Section 605, which upon their face purport to relate to all persons, do not relate to the regulation of communication carriers *and therefore constitute a rule of evidence in the purest sense.*" Sablowsky v. United States, *supra*, 101 F.2d at 189. [My emphasis.]

The official representatives of three Presidents—Presidents Truman, Eisenhower, and Kennedy—introduced legislation and actively beseeched Congress to amend this statute so that the government could utilize the fruits of interception in espionage cases and cases involving national security. They uniformly represented that what the Act of 1934 expressly forbade was the *divulgence* of the information received by interception, that the problem was not so much the act of interception, but the divulging in court of that which was learned from interception.

Former Attorney General Herbert Brownell, Jr., observed that after passage of the 1934 Act, "[t]he question soon arose as to whether mere interception by federal agents of messages was forbidden by Section 605. The Attorney General at that time took the view that what the law prohibited was *both* interception *and* divulgence, and that mere report of the intercepted message to public officials by FBI or other federal agents did not constitute divulgence. . . . None of the decisions [*Nardone*] rendered by the Supreme Court held that wire tapping by federal officers in and of itself was illegal, absent divulgence." Brownell, "Public Security and Wire Tapping," 39 Cornell L.Q. 195, 197, 198 (1954).[11]

"[T]he President, both as Commander-in-Chief and as the Nation's órgan for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world." Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., *supra*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). The growing complexity and sophistication of modern society have led to the recognitition that sophisticated techniques are required for gathering intelligence information where national security is involved. As early as 1876, the Supreme Court recognized the presidential power

to conduct intelligence operations in order to protect the security of the nation. Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1876). In 1940, President Roosevelt, in a confidential memorandum to Attorney General Robert H. Jackson recognized the necessity of wiretapping in matters "involving the defense of the Nation." President Truman expressly approved this practice as have all Attorneys General since 1940.

When Secretary of State William P. Rogers was Deputy Attorney General he wrote a perceptive article which completely supports my analysis that there is a basic distinction under § 605 between the right to intercept and the right to use interceptions as evidence. Rogers, "The Case for Wire Tapping" 63 Yale L.J. 792 (1954): "It has long been the position of the Department of Justice that mere interception of telephone communications is not prohibited by federal law." 63 Yale L.J. at 793. Mr. Rogers outlined the long struggle of Attorneys General to persuade Congress to enact legislation to permit the introduction into evidence of intercepted communications in criminal prosecutions. "Attorney General J. Howard McGrath submitted wire tap legislation for introduction in the 82d Congress. In doing so, he repeated [a plea of former] Attorney General Clark and indicated that such legislation would 'enable the prosecution of present, futuré, and past violations of laws endangering our internal security, not barred by the statute of limitations, which would otherwise go unpunished to the detriment of the Nation.'" 63 Yale L.J. at 795.

Mr. Rogers states that Attorney General McGrath reaffirmed the inability of his department to fulfill "its statutory duty of prosecuting," and that Attorney General Herbert Brownell complained to Congress that without wiretap legislation "the hands of prosecuting officers are tied and their efforts to maintain the security of the Nation are thwart-

---

11. The debate on the Communications Act of 1934 did not discuss § 605. Mr. Brownell reports: "Not one word is said about making evidence obtained by wire tapping inad-

missible in evidence or about prohibiting wire tapping." See 73 Cong.Rec. 4138, 8822–8837, 8842–8854, 10304–10332 (1934). 39 Cornell L.Q. at 197 n. 10.

ed." [12] "Again, on November 17, 1953, Attorney General Brownell advised a congressional committee that the work of the Department of Justice *has clearly shown the need for legislation which would permit the use of wire tap evidence in espionage cases.* He advised that there are cases of espionage presently in the Department of Justice but that *since some of the important evidence was obtained by wire tapping,* such cases could not be brought to trial so long as the law remains in the present state." 63 Yale L.J. at 796. (Emphasis supplied.) Significantly, the "law" explicitly referred to by Mr. Rogers and Attorney General Brownell was the instruction contained in the *Nardone* cases, as amplified by Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L. Ed. 298 (1939), applying the doctrine to intrastate as well as interstate communications. 62 Yale L.J. 793 nn. 5, 6, and 7.

The efforts of the various Attorneys General came to fruition with the passage of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *supra.* Unlike § 605, the present wiretap statute, 18 U.S.C. § 2511(3), note 6, *supra,* contains a provision providing for the evidentiary use of intercepted communications: "The contents of any wire or oral communication intercepted by authority of the President in the exercise of . . . [his constitutional] powers may be received in evidence in any trial hearing. . . ."[13]

Attorney General Robert F. Kennedy testifying before Congress on May 22, 1962, in support of H.R. 10185, dramatically pin-pointed the deficiencies in § 605:

Why do I say the existing situation is unsatisfactory?

The existing federal law on wiretapping is Section 605 of the Communications Act of 1934, which provides in part:

". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person . . ."

This law is unsatisfactory in two respects. It permits anyone to tap wires. Mere interception is not a crime; a crime is not committed until the intercepted information is divulged or published. (Another provision makes it a crime to use such information for one's own benefit.)

Thus even if we find an intercepting device attached to a telephone line, and find out who is doing the intercepting, we still cannot prosecute. We have to find that the information was divulged or published or used improperly. This means that no one's privacy is adequately protected. Anyone can listen in to your telephone conversations, and mine, without violating the federal law.

On the other hand, all divulgence is prohibited. *This means that it is against the law for law enforcement officials to disclose in court any of the words they overhear from wiretapping or the substance, purport, or effect of those words—even though what they overhear is clear evidence of a vicious crime.*

---

12. Letter of May 7, 1953, to the Speaker of the House of Representatives and the Vice President, transmitting a wiretap legislative proposal.

13. I emphasize again that I do not meet the constitutional issue of the President's power under Title III of the Act of 1968 to wiretap without a court order to gather foreign intelligence information, the question reserved in United States v. United States District Court, *supra.*

Section 605 does not appear to inhibit the Chief Executive from fully conducting the necessary operations within the framework of the Executive Branch, other than the use of the evidence in prosecutions. Thus, in the case at bar, Gleb Pavlov, Yuri Romashin, and Vladimir Olenev, who were named as co-conspirators but not defendants in the indictments, were accredited representatives of the Permanent Mission of the Union of Soviet Socialist Republics to the United Nations. They were declared *personna non grata* and departed the United States.

The Supreme Court so held with respect to federal officers in the *Nardone* case, decided in 1937. And it so held with respect to state officers in the *Benanti* case, decided in 1957. Indeed, the federal courts refuse to receive in evidence, not only the substance of the intercepted conversation, but any evidence obtained as a result of leads which that conversation gave. As a result, wiretapping cannot be used effectively by the federal government or the states to aid in law enforcement, even for the most serious crimes.

The strange paradox is that under this federal law a private individual is free to listen in to telephone conversations for the most improper motives, but law enforcement officials cannot use wiretapping effectively to protect society from major crimes.

Hearings on Nominations of William H. Rehnquist and Lewis F. Powell Before the Senate Committee on the Judiciary, 92nd Cong., 1st Sess., at 145 (1971). (Emphasis supplied.)

Attorney General Kennedy stated that the passage of the bill was needed for national security cases:

Wiretapping is an important tool in protecting the national security. In 1940, President Roosevelt authorized Attorney General Jackson to approve wiretapping in *national security cases*. Attorney General Clark, with President Truman's concurrence, extended this authorization to kidnapping cases.

As Congress has been advised each year by the Director of the Federal Bureau of Investigation, the practice has continued in a limited number of cases upon express permission from the Attorney General. But, as I have pointed out, the evidence received from these wiretaps or developed from leads resulting from these wiretaps cannot be used in court. It is an anomalous situation to receive information of a heinous crime and yet not be able to use that information in court.

And, of course, this applies not only in cases of *espionage and treason* but in pressing the fight against organized crime.

\* \* \* \* \* \*

H.R. 10185 would authorize wiretapping and introduction of wiretap evidence in court for the following federal offenses:

Crimes affecting the national security: *Espionage, sabotage, treason, sedition,* subversive activities and unauthorized disclosure of atomic energy information;

\* \* \* \* \* \*

*Ibid.,* at 146–147. (Emphasis supplied.)

I am persuaded, therefore, that the district court erred in equating an assumed presidential power to intercept with the right to "divulge or publish" that which was intercepted. I would hold that assuming a constitutional prerogative of the Chief Executive to intercept, the doctrine of *Nardone* prevents, under strictures of § 605, divulging or publishing the contents of the interception. In this context any use of the intercepted material beyond the confines of the Executive Branch would have been contrary to the statutory prohibition. I would remand these proceedings to the district court for reconsideration in accordance with the foregoing analysis.

On the present state of the record I would agree with the government's contention that additional overhearings of Ivanov's conversations following his conviction were not within the mandate for disclosure of "electronic surveillance which might have violated defendants Fourth Amendment rights and tainted their convictions."

Judge Van Dusen joins in this opinion.

GIBBONS, Circuit Judge (dissenting in part).

I concur in the court's determination that the district court did not err in concluding that the evidence used at Ivanov's trial was not the tainted fruit of anything heard in the electronic surveillances the contents of which are preserved in the first set of logs. I dissent from the majority's conclusion that the

tainted fruits of the electronic surveillances the contents of which are preserved in the second set of logs were admissible at his trial because the interceptions were lawful. While I agree with much that Judge Aldisert says in part III of his opinion with respect to 47 U.S.C. § 605, I find it difficult to accept the construction which separates the prohibition against interception from the prohibition against disclosure and which treats the latter as a mere rule of evidence. I agree with Judge Adams that if the statute applies to the executive functioning in the field of foreign affairs intelligence by its plain language, it prohibits both interception and disclosure. His analysis suggests that if it prohibits the executive from intercepting foreign affairs intelligence, it may be beyond the power of Congress. Thus he adopts a construction making § 605 inapplicable to the executive when functioning in the field of foreign affairs intelligence. That construction is as strained as Judge Aldisert's construction.

> We . . . face the fact that the plain words of § 605 forbid anyone, unless authorized by the sender, to intercept a telephone message, and direct in equally clear language that *"no person"* shall divulge or publish the message or its substance to *"any person."* Nardone v. United States, 302 U.S. 379, 382, 58 S.Ct. 275, 276, 82 L. Ed. 314 (1937).

Judge Learned Hand had no difficulty in understanding the plain language of § 605 when in United States v. Coplon, 185 F.2d 629 (2d Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L. Ed. 688 (1952), he applied it to interceptions for foreign affairs intelligence. Nor do I. As I read it, the statute by its plain language applied at the time of the interceptions here in issue to everyone including the President's agents gathering foreign affairs intelligence.

Obviously Congress thought as much when it amended § 605 by the enactment of § 2511(3) of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(3). This reading requires that I confront the constitutional limitation on congressional power postulated by Judge Adams as a reason for his interpretation. He writes:

> We do not intimate, at this time, any view whatsoever as to the proper resolution of the possible clash of the constitutional powers of the President and Congress. Instead, we merely note that the absence of legislative consideration of the issue does suggest that Congress may not have intended § 605 to reach the situation presented in the present case. In the absence of any indication that the legislators considered the possible effect of § 605 in the foreign affairs field, we should not lightly ascribe to Congress an intent that § 605 should reach electronic surveillance conducted by the President in furtherance of his foreign affairs responsibilities. This would seem to be far too important a subject to justify resort to unsupported assumptions. Majority Opinion at 601.

He suggests, in other words, that had it thought of the problem Congress would have recognized that there is an executive prerogative in the field of foreign affairs intelligence which is constitutionally beyond its power.[1] Thus, he reasons, we may write into § 605 an exception which is not there. I have no doubt that it was well within the power of Congress to forbid, as it did, the agents of the executive from intercepting electronic communications for any purpose, including foreign affairs intelligence. The only limitation on that power that occurs to me is the veto power of the President.

Judge Adams' interpretation of § 605 as exempting the executive's foreign af-

---

1. Nardone v. United States, *supra*, expressly rejected any general governmental prerogative exemption to § 605. 302 U.S. at 383, 58 S.Ct. 275. *Compare* with 1 W. Blackstone, Commentaries on the Laws of England 261 (5th ed. 1773), which explains that "the king is not bound by any act of parliament, unless he be named therein by special and particular words."

fairs intelligence agents leads him inevitably to a decision as to the extent to which the fourth amendment applies to such agents. He concludes that while the fourth amendment theoretically applies, the decisions of those agents as to what is a reasonable invasion of privacy is a matter beyond the scope of judicial review in an appropriate case. That conclusion as to the limits of the judicial power of the United States is premised upon the same executive prerogative which led him to find an exception to § 605 because of the prerogative's apparent limitation upon congressional power. I have no doubt about the power of the article III courts to subject the activities in the United States of the executive's foreign affairs intelligence agents to judicial review for compliance with the fourth amendment in an appropriate case. This is such a case, since on the present record we must assume that the executive is asking an article III court to make evidentiary use against an indicted defendant of the fruits of an invasion of privacy prohibited by that amendment.

Reinforcing my belief in the necessity for a separate expression of views is the fact that Judge Aldisert's dissenting opinion tacitly supports the position that there is an executive prerogative in the field of foreign affairs intelligence which may be beyond the reach of those checks and balances which in one way or another limit every other power of the central government.[2] A doctrine so out of keeping with our institutions of government, so potentially dangerous to the rights of privacy secured by the fourth amendment, and so capable of extension to other constitutional safeguards requires an explicit rejection.

Judicial review not only of reasonableness but even of the need for a warrant, according to the majority, is limited solely to a determination that the invasion of privacy was for the purpose of foreign affairs intelligence. The extent of the activities isolated from judicial review by the majority may be appreciated by an example not involving wiretapping. Today nothing would be more vital to the conduct of foreign affairs than accurate knowledge about which grain dealers were in touch with what foreign purchasers, or which oil companies were receiving supplies from what foreign sources. If in pursuit of that information the executive agents burglarized the offices of an international grain dealer or an international oil company without the benefit of a warrant, and found evidence of a violation of the Sherman Antitrust Act, evidence obtained in the burglary could, under the majority interpretation of the fourth amendment, be used in a criminal prosecution under 15 U.S.C. §§ 1–3, 8. The court's role would be limited to a determination that the burglary was aimed at "the policy positions of foreign states on a broad range of international issues." Majority Opinion at 608.

The majority's awesome executive prerogative for gathering foreign affairs intelligence cannot be found in the text of the Constitution. Indeed, the majority opinion acknowledges as much by its rather gingerly embrace of United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and by paying lip service to the

2. Judge Aldisert writes, at 622–623,

> It is beyond question that the President, as Chief Executive, possesses certain powers and responsibilities which are not dependent upon a specific legislative grant from Congress, but derive from the Constitution itself. This principle was announced as early as Marbury v. Madison, 1 Cranch (5 U.S.) 137, 165–166, 2 L.Ed. 60 (1803):
> By the Constitution of the United States the President ·is invested with certain important political powers, in the exercise of

> which he is to use his own discretion, and ia accountable only to his country in his political character, and to his own conscience.
> United States v. Belmont, 301 U.S. 324, 328, 57 S.Ct. 758, 760, 81 L.Ed. 1134 (1937), held that "the conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this power [is] not subject to judicial inquiry or decision." (footnotes omitted).

general applicability of the fourth amendment. But the holding on the fourth amendment issue, that the executive department's decision on reasonableness of the invasion of privacy is beyond the scope of judicial review, and the suggestion that § 605, if literally applied, might be beyond the power of Congress, are necessarily predicated upon the existence of a foreign affairs executive prerogative that is either implied from the Constitution or extraconstitutional. While in footnote 37 Judge Adams acknowledges recent scholarship casting doubt upon Justice Sutherland's thesis of an extraconstitutional foreign affairs prerogative or its acceptance by the Supreme Court, his opinion assumes at the very least that such a prerogative is implied from the Constitution. The result of that assumption is that what is a "reasonable" invasion of privacy for the purpose of foreign affairs intelligence is subject neither to congressional control nor to judicial review. While the result follows logically from the assumed premise, for the reasons which follow I reject the premise.

Before going to those reasons, consider some things not involved in this case. Since both § 605 and the fourth amendment operate only within the territory of the United States, we are not here concerned with the activities of the executive's foreign affairs intelligence agents operating outside that territory. But the foreign intelligence gathering activities of the executive provide a useful example negating any congressional belief that even outside the United States the President has a foreign affairs intelligence prerogative free from congressional control. In the National Security Act of 1947, ch. 343, 61 Stat. 497, and the Central Intelligence Agency Act of 1949, ch. 227, 63 Stat. 208, Congress enacted a scheme of regulation of the activities of foreign affairs intelligence agents. See 50 U.S.C. §§ 401–412. The congressional creation of the Central Intelligence Agency actually dis-

placed an intelligence gathering agency, the Central Intelligence Group, which had been created by Executive Order. See S.Rep.No.239, 80th Cong., 1st Sess. (1947) (reprinted in U.S.Code Cong. & Ad.News 1494 (1947). These statutes do not deal with internal security and in present form exclude the agency from that area. 50 U.S.C. § 403(d)(3). They assume congressional power to deal with intelligence gathering for external security. They were enacted after the *Nardone* Court interpreted § 605 to apply to federal agents and after its express rejection of a general governmental prerogative exemption to § 605.[3] Congress was aware of the *Nardone* interpretation of § 605 when it dealt with external security in the Central Intelligence Agency Act. While the statutes governing the Central Intelligence Agency are less comprehensive in regulating the extraterritorial activities of executive foreign affairs intelligence agents than many thoughtful persons might hope for, I have no doubt, and I hope the Congress has no doubt, that it is well within congressional competence to place greater limits upon even those activities.[4] That, however, is not the issue in this case. Here we are dealing with activities of intelligence agents within the United States. Another matter not involved in this case is any pretense that there is an executive prerogative beyond congressional control or judicial review in matters of internal security. That pretense ended with United States v. United States District Court for the Eastern District of Michigan, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). According to the Supreme Court a President in Lincoln's position, faced with an internal insurrection, remains subject to judicial review of his agents' compliance with the fourth amendment. But according to the majority, a peace-time President can decide, free of either congressional control or judicial review, what invasions of privacy are reasonable in the interest of his

3. *See* note 1 *supra*.

4. *Cf.* War Powers Resolution, Pub.L. No. 93–148, 87 Stat. 555 (1973); International

Agreements—Transmission to Congress, Pub.L. No. 92–403, 86 Stat. 619 (1972) (codified at 1 U.S.C. § 112b).

conduct of foreign affairs. The contrasting congressional and judicial treatment of these two matters not involved in the case—intelligence gathering outside the United States, and intelligence gathering for internal security purposes—illustrate the anomaly of the majority's constitutional position.

The only analytical support for the majority position that there is an executive prerogative in the field of foreign affairs intelligence beyond the reach of congressional control or judicial review is Justice Sutherland's opinion in United States v. Curtiss-Wright Export Corp., *supra*. While some of its sweeping language does lend such support, its holding does not.[5] Its holding involved congressional action in the field of foreign affairs; namely the constitutionality of the Joint Resolution of May 28, 1934, ch. 365, 48 Stat. 811 (1934), which provided:

> *Resolved* . . ., That if the President finds that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reestablishment of peace between those countries, and if after consultation with the governments of other American Republics and with their cooperation, as well as that of such other governments as he may deem necessary, he makes proclamation to that effect, it shall be unlawful to sell, except under such limitations and exceptions as the President prescribes, any arms or munitions of war in any place in the United States to the countries now engaged in that armed conflict, or to any person, company, or association acting in the interest of either country, until otherwise ordered by the President or by Congress.

> Sec. 2. Whoever sells any arms or munitions of war in violation of section 1 shall, on conviction, be punished by a fine not exceeding $10,000 or by

imprisonment not exceeding two years, or both.

Curtiss-Wright, indicted for conspiracy to violate that statute, moved to quash the indictment not on the ground that Congress had assumed too much in legislating upon the subject of foreign affairs, but on the ground that it had in § 1 delegated too much to the executive's discretion. The problem presented to the Supreme Court was how to get out from the corner into which it had painted itself in Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446 (1935) and Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). Those cases, since largely repudiated, had held that in enacting domestic legislation Congress could not delegate legislative powers. It could only legislate in the manner set forth in the Constitution, because the Constitution was a limited surrender of sovereignty by the states. To get around *Panama* and *Schechter* Justice Sutherland concluded that while the domestic powers of the federal government were ceded to it from the states, it derived its foreign affairs powers directly from George III. Federal power over foreign affairs was plenary rather than derivative. Thus Congress could in the foreign affairs field make a delegation to the executive which in the domestic field would be unconstitutional. Professor Lofgren has amply demonstrated that the line of descent from George III to the federal government of 1934 was nowhere near as direct as Justice Sutherland suggested. Lofgren, United States v. Curtiss-Wright Corporation: An Historical Reassessment, 83 Yale L.J. 1 (1973). We can, however, for present purposes accept the proposition that federal sovereignty over foreign affairs is of an entirely different order of magnitude than over domestic affairs. But it is one thing to say that the federal government succeeded to the foreign affairs

---

5. "United States v. Curtiss-Wright Corp., 299 U.S. 304, [57 S.Ct. 216, 218, 81 L.Ed. 255,] involved, not the question of the President's power to act without congressional authority, but the question of his right to

act under and in accord with an Act of Congress." Youngstown Steel & Tube Co. v. Sawyer, 343 U.S. 579, 635 n. 2, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1951) (Jackson, J., concurring).

prerogatives of George III. It is quite another to say that those prerogatives have passed from George III to George Washington and in unbroken succession to Richard Nixon. Even granting that the foreign affairs powers of the federal government are plenary rather than derivative from the states, both the text of the Constitution and the history of its adoption make clear that those powers are subject to the same kinds of checks and balances as are all other powers of the national government.[5a]

Prior to the Declaration of Independence the colonies had no competence in foreign affairs. That field was a matter of English sovereignty. Under English public law the conduct of foreign affairs was entrusted to the executive rather than shared with Parliament. Blackstone's Commentaries on the Laws of England, completed in 1769 and well known to the founding fathers, contains an extensive exposition of the English public as well as private law. Matters which today we would include in the general categories of foreign affairs and external security are dealt with in chapter seventh of the first book, entitled "Of the KING's PREROGATIVE." Blackstone lists five external[6] and five domestic prerogatives.[7] Reference to all of these prerogatives appears in some form or another in later American constitutional documents. As Blackstone makes clear,[8] and as contemporary English constitutional practice confirms,[9] these matters of the king's prerogative were not personal to the king, but to the executive branch of the government. The government could be removed by Parliament, but it exercised the king's prerogative while it continued in office, free from parliamentary interference. I will return to the specifics of the king's prerogatives listed by Blackstone hereafter.

In 1774 the Continental Congress came into existence and soon took the form of a national legislative assembly. Its status as a national legislative assembly was de facto until July 4, 1776. In that de facto period the First Continental Congress tacitly assumed that the colonies were still in union with England and were seeking nothing more than domestic law reform. *See, e. g.,* Declaration and Resolves of the First Continental Congress, October 14, 1774 in 1 Journals of the Continental Congress 63 (W. C. Ford ed. 1904). The battle of Lexington on April 19, 1775 of necessity introduced a new element into the deliberations of the Continental Congress. Actual war put that one legislative branch of the national government inevitably in a position, in which the British Parliament had never been, of conducting foreign affairs. *See, e. g.,* Address of the Continental Congress to the Inhabitants of Canada, May 29, 1775 in 2 Journals of the Continental Congress 68 (W. C. Ford ed. 1905). On June 7, 1776 Richard Henry Lee introduced a tripartite resolution (1) calling for independence for the United Colonies, (2) calling for effective measures for the forming of foreign alliances, and (3) calling for preparation of a plan of confederation. Resolution for Independence, June 7, 1776, in 5 Journals of the Continental Congress 425 (W. C. Ford ed. 1906). The first resolution produced the Declaration of Independence in which the United Colonies explicitly assumed sovereignty in foreign affairs.[10] The third resolution produced the Articles of Confederation, approved by Congress on November 15, 1777 and finally ratified on March 1, 1781. Foreign affairs authority was conferred by article IX on the Congress. That the framers of the Articles of Confederation were dealing with the same foreign affairs authority

---

5a. *See* the thorough analysis of the relevant historical materials in Bestor, Separation of Powers in the Domain of Foreign Affairs: The Intent of the Constitution Historically Examined, 5 Seton Hall L.Rev. 527 (1974).

6. 1 W. Blackstone, Commentaries on the Laws of England 253–61 (5th ed. 1773).

7. *Id.* at 261–80.

8. *E.g., id.* at 250, 333–35.

9. *See* E. Wade & G. Phillips, Constitutional Law 160, 173–74 (6th ed. 1960).

10. "[T]hese United Colonies . . . have full Power to levy War, conclude Peace, Contract Alliances . . . ." Declaration of Independence, July 4, 1776.

that was a matter of the king's preroga-
tive described by Blackstone, and with
the same foreign affairs authority that
in 1787 was distributed in the present
Constitution, can be seen from a com-
parison of the three texts.

| Blackstone's Commentaries Ch. VII | Articles of Confederation Article IX | The Constitution of 1787 |
|---|---|---|
| | "The united states in congress assembled, shall have the sole and exclusive right and power": | |
| 1. "[T]he king has . . . the sole prerogative of making war and peace." p. 257. | "of determining on peace and war," | "The Congress shall have Power . . . [t]o declare War." Art. I, § 8, cl. 11. The President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties." Art. II, § 2, cl. 2. |
| 2. "The king . . . has the sole power of sending embassadors to foreign states, and receiving embassadors at home." p. 253. | "of sending and receiving ambassadors," | The President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls." Art. II, § 2, cl. 2. The President "shall receive Ambassadors and other public Ministers." Art. II, § 3. "In all Cases affecting Ambassadors, other public Ministers and Consuls . . . the supreme Court shall have original Jurisdiction." Art. III, § 2, cl. 2. |
| 3. "It is . . . the king's prerogative to make treaties, leagues, and alliances with foreign states and princes." p. 257. | "[of] entering into treaties and alliances," | The President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties." Art. II, § 2, cl. 2. |
| 4. | "of establishing rules for deciding in all cases, what captures on land or water shall be legal, and in what manner prizes taken by land or naval forces . . . shall be divided or appropriated," | "The Congress shall have Power . . . [t]o . . . make Rules concerning Captures on Land and Water." Art. I, § 8, cl. 11. "The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction." Art. III, § 2, cl. 1. |
| 5. "[O]ur laws have in some respect armed the subject with powers to impel the prerogative; by directing the ministers of the crown to issue letters of marque and reprisal upon due demand." p. 258. | "of granting letters of marque and reprisal in times of peace," | "The Congress shall have Power . . . [t]o . . . grant Letters of Marque and Reprisal." Art. I, § 8, cl. 11. |
| 6. | "[of] appointing courts for the trial of piracies and felonies committed on the high seas," | "The Congress shall have Power . . . [t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." Art. I, § 8, cl. 10. |

| Blackstone's Commentaries Ch. VII | Articles of Confederation Article IX | The Constitution of 1787 |
| --- | --- | --- |
| 7. "In this capacity therefore, of general of the kingdom, the king has the sole power of raising and regulating fleets and armies." p. 262. <br><br> "The king is likewise the fountain of honour, of office, and of privilege." p. 271. | "[of] appointing all officers of the land forces, in the service of the united states, excepting regimental officers.——appointing all the officers of the naval force, and commissioning all officers whatever in the service of the united states," | "The Congress shall have Power . . . [t]o provide for organizing . . . the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers." Art. I, § 8, cl. 16. <br><br> The President "shall nominate and by and with the Advice and Consent of the Senate, shall appoint . . . all . . . Officers of the United States, whose Appointments are not herein otherwise provided for." Art. II, § 2, cl. 2. <br><br> The President "shall Commission all of the Officers of the United States." Art. II, § 3. |
| 8. "[T]he king has the sole power of raising and regulating . . . armies." He has "the prerogative of enlisting and of governing them." p. 262. | "[of] making rules for the government and regulation of the . . . land and naval forces," | "The Congress shall have Power . . . [t]o make Rules for the Government and Regulation of the land and naval Forces." Art. I, § 8, cl. 14. |
| 9. "The king is . . . generalissimo, or the first in military command, within the kingdom." p. 262. | "[of] directing [the] operations" "of the said land and naval forces," | "The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." Art. II, § 2, cl. 1. |
| 10. "[P]artly [because he is generalissimo], and partly . . . to secure marine revenue . . . the king has the prerogative of appointing *ports* and *havens* . . . for persons and merchandize to pass into and out of the realm, as he in his wisdom sees proper." p. 263–64. | "[of] entering into treaties and alliances, provided that no treaty of commerce shall be made whereby the legislative power of the respective states shall be restrained from imposing such imposts and duties on foreigners, as their own people are subjected to." | "The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations." Art. I, § 8, cl. 3. |
| 11. "[T]he king has the sole power of raising and regulating fleets." He has "the prerogative of enlisting and governing them." p. 262. | "The united states in congress assembled shall have authority . . . to build and equip a navy." | "The Congress shall have Power . . . [t]o provide and maintain a Navy." Art. I, § 8, cl. 14. |
| 12. "[T]he king has the sole power of raising and regulating . . . armies." p. 262. | "The united states in congress assembled shall have authority . . . to agree upon the number of land forces." | "Congress shall have Power . . . [t]o raise and support Armies," art. I, § 8, cl. 12, and "[t]o provide for calling forth the Militia," art. 1, § 8, cl. 15. |

The twelve references in the right hand column above contain all the textual references in the Constitution even arguably bearing upon the existence of an executive prerogative in the matter of foreign affairs and external security. As can be seen in the middle column, every one of them was a matter of legislative prerogative in the Continental Congress. And almost every one of them was a matter of executive prerogative in Colonial times. Significance must be attached to the distribution of these powers in the Constitution of 1787. The most significant aspect of the distribution is that there are only two instances in which the framers resorted to the model of the British Constitution. One is article II, section 3 granting the President alone the power to receive ambassadors and other public ministers. The other is article II, section 2, clause 1 making the President commander-in-chief of the army and navy. In every other instance the former prerogatives of the Continental Congress were either retained for the national legislature or divided among the separate branches of the national government. That the Articles of Confederation and the Constitution of 1787 were dealing with the same foreign affairs and external security subject matters may be gleaned by a comparison of the virtually identical restrictions placed upon state governments by article VI of the Articles of Confederation and article I, section 10, clause 3 of the Constitution.[11]

The ratifying conventions must have been well aware that in Colonial times foreign affairs and external security were matters of executive prerogative and that the Congress had first assumed and then been granted these powers in their totality. The ratifying conven-

tions must have been well aware, then, that the new constitution deliberately distributed those formerly legislative powers among the three branches of the federal government, thereby subjecting them to the system of checks and balances that was the central core of the 1787 compromise. What came back from the ratifying conventions was a series of proposals for a bill of rights which would limit the entire power of the central government, including its power in matters of foreign affairs and external security. That the bill of rights did not exempt these areas can be seen from the fact that the second amendment imposed a limitation upon congressional powers under article I, section 8, clause 16 and article I, section 10, clause 3. It can be seen, moreover, in the third amendment:

> No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

No reason suggests itself to me why the fourth amendment should be considered as applicable to the foreign affairs or external powers of the central government in any lesser or different manner than to all its other powers.

Since American prerogatives in foreign affairs and external security started as legislative powers, the provisions transferring some of those powers to the executive in 1787 should, it seems to me, be read narrowly rather than expansively. I cannot read into the commander-in-chief clause and the clause authorizing the President to receive (but not, without the advice and consent of the Senate, send) ambassadors any general exemption of congressional authority to

---

11. An opinion is not the appropriate place to set forth all the evidence from the debates in the Convention of rejection of the British model of executive power. The remarks of James Wilson of Pennsylvania, later a Justice of the Supreme Court, are sufficiently typical. Madison quotes him:

"He did not consider the Prerogatives of the British monarch as a proper guide in

defining the Executive powers. Some of these prerogatives were of a Legislative nature. Among others that of war & peace & c." 1 Farrand, The Records of the Federal Convention 65–66 (1911) (Madison's notes).

As the text makes clear, Wilson's view prevailed in the Convention.

interfere with the manner in which foreign affairs intelligence shall be gathered in the United States. Thus I have no question that Congress could, and did in § 605, prohibit anyone, including foreign affairs intelligence agents, from wiretapping. If a majority of the court were to accept that construction of § 605, we could end our inquiry at this point, leaving to another case the separate operation of the fourth amendment on such agents. Because the majority of the court does not so construe § 605, the fourth amendment issue must be decided.

The Constitution must, of course, be construed as a living document. Perhaps had the telephone been invented in 1789 the bill of rights would have dealt with it explicitly, as it dealt with quartering of soldiers and searches of houses. But while the document must today be construed in light of the events upon which it is contemporaneously brought to bear, the contemporaneous glare should not blind us to the clearly intended meaning of the text. Perhaps in the light of contemporary international power relationships the executive should be reinvested with the foreign affairs prerogatives of George III, subject only to removal upon loss of confidence by a legislative majority. That could be accomplished by a constitutional amendment, a procedure the founding fathers provided for. But the judiciary is powerless to provide the accountability to the legislature which in the British Constitution substitutes for our system of dispersal of power by virtue of checks and balances imposed by independent branches of government. The majority opinion removes the checks and balances upon executive power in the field of foreign affairs intelligence of congressional initiative and consultation and of judicial review, without restoring the alternative of accountability to the current majority in the legislature. If we must in our constitutional interpretations move with the times, let us not exchange more for less. Our political process allows for a change of the executive branch only quadrennially. As a substitute for contemporaneous political accountability the Constitution provides that the executive can act upon individuals only through the judicial power of the United States. Any time the federal executive proposes to exercise a criminal sanction against an individual it must submit to judicial review of its actions in a regular court in the regular manner. Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866). In such a court, when the defendant asserts defensively that federal agents, acting for a foreign affairs intelligence purpose or for any other purpose, violated the fourth amendment, the court must independently determine whether the challenged action complied with the amendment. It cannot defer that decision in whole or in part to the executive any more than it can defer the trial of the action to a military commission.

The government urges that the reasons for invasions of privacy for external security purposes are quite different from those relied upon in enforcement of the criminal law. From this, it is urged, any kind of a warrant requirement would be impracticable. For this reason it urges that post-invasion judicial review should also be denied. I see no such inpracticability.[12] It would be

---

12. Carefully circumscribed relaxation of the traditional fourth amendment probable cause and reasonableness standards in response to strong governmental and public needs is not a novel task for the Supreme Court. When confronted with the need for municipal fire, health and safety inspections, the Court sanctioned issuance of warrants without a showing of probable cause that a particular dwelling contained a violation, but rather only upon satisfaction of reasonable legislative and administrative standards for conducting an inspection of the area in which the dwelling is located. The Court observed that such inspections are neither personal in nature nor aimed at discovery of evidence of a crime, and thus they involve a relatively limited invasion of privacy. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). In the "stop and frisk" cases,

perfectly feasible for the Congress or for the courts to develop criteria as to when an invasion of privacy for the purpose of gathering foreign affairs intelligence should be permitted. In Camara v. Municipal Court, 387 U.S. 523, 87 S. Ct. 1727, 18 L.Ed.2d 930 (1967), for example, enforcement of the criminal law was not at stake and specific probable cause was not determinable, and yet the Supreme Court was able to develop special criteria for when privacy could be invaded for an administrative search. The task is no more formidable here. It would be perfectly feasible to centralize applications for such warrants in a central court at Washington or in a limited number of courts so as to minimize security problems. The criteria for permitting court authorized invasions of privacy in the name of external security need not be identical to those applicable to criminal law enforcement. Nor need the criteria for emergency exceptions be identical. In each of the intrusions upon less than traditional notions of probable cause which the Supreme Court has suggested or approved,[13] emphasis has been placed on the limited nature of the invasion. Thus a warrant might appropriately issue when the invasion was for eavesdropping rather than for a physical seizure or an intrusive trespatory search. But at a minimum the criteria chosen should protect persons from invasions of privacy when their possible relationship with any source of foreign affairs intelligence information is entirely fanciful, protect persons from invasions of privacy when the possible relationship of the information sought to a legitimate foreign affairs concern is entirely fanciful, and protect persons from invasions far in excess of the legitimate need.

There are, of course, invasions in which it is clear that the zone of privacy sought to be pierced will be highly likely to produce significant information, but which no court could legitimately order. These include, for example, violations of public international law by the entry of embassies. No doubt in some instances the executive operating on a principle of necessity will violate public international law, and the fourth amendment as well, by making such an invasion without a warrant. Probably the political process is the only effective limitation upon such perceived necessities. But if acting on some principle of necessity the executive commits such an invasion, then he must either forego the assistance of the courts in criminal law enforcement or submit to the full scope of judicial review that the fourth amendment requires. He cannot by causing the courts to use the fruits of his violation of public international law and of the fourth amendment make them his accomplice after the fact. The majority reacts:

"It would be unfortunate indeed if, as Judge Gibbons seems to suggest, the President must act illegally to perform his constitutional duties. Yet, if

the Court again used a balancing test to justify an investigatory stop and a carefully limited search for weapons by a police officer on less than probable cause. Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L. Ed.2d 612 (1972) ; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court has also suggested that detentions for the sole purpose of fingerprinting, under narrowly defined circumstances, may "comply with the Fourth Amendment even though there is no probable cause in the traditional sense." The much less serious intrusion upon personal security, the need to be detained only once, the inherent reliability and reduced opportunity for abuse, and the nondestructibility of fingerprints which pro-

vides sufficient time to obtain a warrant, are all urged as justifications. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed. 2d 676 (1969). In each of these situations, when confronted with a compelling public need to invade personal privacy, the Court did not choose to classify the challenged conduct as outside the scope of judicial review but rather chose to maintain judicial control over these necessary activities by devising specially tailored "probable cause" requirements.

13. *See* cases cited in note 12 *supra*. *See also* United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) ; Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

the President must act secretly and quickly to investigate an attempt by a foreign agent to obtain important intelligence information, such a result may follow under Judge Gibbons' analysis." Majority Opinion at 605. This is as gross a distortion of my position as it is of the Constitution. The majority expressly refrains from determining whether there was an emergency need for hasty action which might have excused the necessity for a warrant—a matter the Court ordinarily decides— and expressly refrains from deciding whether there was an overwhelming need for secrecy in this instance. It defers to the executive. I would subject the President's decision to judicial review. In most instances his agents could obtain a warrant. In some instances the decision to forego a warrant because of exigent time circumstances would be approved by the courts. The only instance where executive action could not be approved by the courts would be where there were no exigent circumstances or where no court could legally have issued a warrant. The majority finds a constitutional Presidential duty to act, nevertheless, in violation of public international law and of the fourth amendment. If there is such a duty it is not imposed by the Constitution. If the President acts in response to what he perceives to be some higher duty he must be vindicated elsewhere than in the article III courts.

On the present record at this stage we do not know whether any of the fruits of the second set of surveillances was used at the trial. Since I would hold that those surveillances violated both § 605 and the fourth amendment, I am confronted with a problem that both Judge Adams' opinion and Judge Aldisert's opinion find unnecessary to discuss. That problem is the effect, if any, in this case of 18 U.S.C. § 3504. When this case was before the Supreme Court, the government contended that the surveillance records should first be submitted to the trial judge, who in an ex parte in camera proceeding would first

determine if any of the information obtained in the surveillance was "arguably relevant" to Ivanov's conviction. Only if the district court made a finding of "arguable relevancy" would the government be required to disclose the surveillance records to the defendant or his attorney. A majority of the Court rejected that result and ruled:

Although this may appear a modest proposal, especially since the standard for disclosure would be "arguable" relevance, we conclude that surveillance records as to which any petitioner has standing to object should be turned over to him without being screened *in camera* by the trial judge. Alderman v. United States, 394 U.S. 165, 182, 89 S.Ct. 961, 971, 22 L.Ed.2d 176 (1968).

Thereafter the district court complied with the Supreme Court's mandate with respect to what we have referred to as the first set of logs. But because it concluded that the second set of logs reflected legal surveillances, it did not allow inspection of these. While the case was pending Congress enacted Section 702 of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 935 (codified at 18 U.S.C. § 3504). That statute provides:

(a) In any trial, hearing, or other proceeding in or before any court . . .

(2) disclosure of information for a determination if evidence is inadmissible because it is the primary product of an unlawful act occurring prior to June 19, 1968, or because it was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, shall not be required unless such information may be relevant to a pending claim of such inadmissibility; . . .

Thus § 3504(a)(2) adopts, for unlawful interceptions which occurred prior to June 19, 1968, the position advanced by the government and rejected by the Supreme Court in this case that the trial

judge may make an ex parte in camera determination of relevancy.[14] Section 703 of Pub.L. No. 91–452 makes § 3504(a)(2) applicable "to all proceedings, regardless of when commenced, occurring after the date of its enactment [October 15, 1970]." Thus Congress intended § 3504(a)(2) to apply to proceedings in this case occurring after October 15, 1970. Since I would remand for determination of taint with respect to the second set of surveillance records, it is also necessary to decide whether that determination should be made in compliance with the statute or in compliance with the Supreme Court's mandate.

Absent the statute it is clear that a lower court must follow the law of the case announced by the Supreme Court. *E.g.,* United States v. Haley, 371 U.S. 18, 83 S.Ct. 11, 9 L.Ed.2d 1 (1962); Sibbald v. United States, 37 U.S. (12 Pet.) 488, 9 L.Ed. 1167 (1838); *cf.* Butcher & Sherrerd v. Welsh, 206 F.2d 259 (3d Cir. 1953), cert. denied, 346 U.S. 925, 74 S.Ct. 312, 98 L.Ed. 418 (1954). Thus the statute confronts us with the question whether Congress has the power to change the law of the case in a case remanded from the Supreme Court. It also confronts us with the question whether in rejecting the ex parte in camera determination of arguable relevancy the Supreme Court was announcing a rule of criminal procedure or a constitutional rule of due process. For whatever congressional power there may be over the law of the case, there is no congressional power to revise the Supreme Court's interpretation of the Constitution.

My research has uncovered no case in which the Supreme Court has ever considered whether Congress has the power to change the law of the case in a remanded case. Some guidance can be found in Pennsylvania v. Wheeling & Belmont Bridge Co., 54 U.S. (13 How.) 18, 14 L.Ed. 249 (1852), 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855). *Bel-*

*mont Bridge* was a case in the Supreme Court's original jurisdiction. It entered an injunction directing the dismantling of a bridge across the Ohio river as an obstruction of a navigable stream. Before the decree was carried out Congress passed a statute "[t]hat the bridges across the Ohio River . . . are hereby declared to be lawful structures in their present positions and elevations, and shall be so held and taken to be, anything in the law or laws of the United States to the contrary notwithstanding." 59 U.S. (18 How.) at 429. The Court determined that Congress had the constitutional power to pass a law permitting a bridge across a navigable stream. It vacated the injunction. The case recognizes that the Supreme Court will apply a law changing the law of the case in a case pending before it. In United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871), the court distinguished the *Belmont Bridge* case when it held unconstitutional a statute which purported to deprive it of jurisdiction to decide the effect to be given to a Presidential pardon any way except as directed in the statute. The Court in *Klein* said:

> We must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power. 80 U.S. (13 Wall.) at 147.

I do not read *Klein* as laying down any prohibition against Congress legislating the law to be applied in a pending case. The problem was that it attempted to lay down a rule of decision on a question of constitutional law, in that case the effect to be given to a Presidential pardon. If, then, the Supreme Court's ruling that the Court may not make an ex parte determination of possible relevance is not a constitutional decision, it would seem that it would follow *Belmont Bridge* rather than *Klein* and apply § 3504(a)(2). Neither *Belmont Bridge* nor *Klein* enlighten on the question of a

14. *See* H.R.Rep. No. 91–1549, 91st Cong. 2d Sess. (1970) (reprinted in 2 U.S.Code Cong. & Ad.News, 4027 (1970), explaining that an ex parte in camera procedure was intended.

conflict between the Court's mandate to a lower court and a subsequent statute, since in both instances the effect to be given to the statute was determined in the highest Court.

The only case ever to consider such a conflict in a lower court context, so far as my research has been able to uncover, is Banco Nacional de Cuba v. Farr, 383 F.2d 166 (2d Cir. 1967), cert. denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968). In Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S. Ct. 923, 11 L.Ed.2d 804 (1964), the Supreme Court reversing the Second Circuit, held that the act of state doctrine applied to prevent the lower court from examining the validity under international law of an expropriation by the Cuban government. The case was remanded to the district court to hear and decide any litigable issues of fact and for proceedings consistent with its opinion. Before final judgment in the remanded case Congress passed the Hickenlooper Amendment to the Foreign Assistance Act of 1964, Pub.L. No. 88–633, § 301(d)(4), 78 Stat. 1013 (codified, as amended, at 22 U.S.C. § 2370(e)), which provided:

> Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law . . . . "

The amendment in effect overruled the principle of the federal common law of international relations announced by the Supreme Court. The Second Circuit concluding that the amendment was intended to apply to pending litigation, was faced with the identical problem before us—a conflict between the Court's mandate and the statute. Judge Waterman wrote:

> "The Supreme Court mandate rule is nothing more than one specific application of a general doctrine appellate courts apply to their orders to lower courts, a doctrine commonly referred to as the law of the case, see Briggs v. Pennsylvania R. R., 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); Ex Parte Sibbald v. United States, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838). Other courts in applying the law of the case rule have held that a lower court is not bound to follow the mandate of an appellate court if the mandate is, in the interim, affected by an authority superior to the court issuing the mandate, such as by a higher appellate court, either state or federal, see, e. g., Higgins v. California Prune & Apricot Grower, Inc., 3 F.2d 896 (2 Cir. 1924); Zerulla v. Supreme Lodge O. of M.P., 223 Ill. 518, 79 N.E. 160 (1906); Jones v. Harmon, 122 Ohio St. 420, 172 N.E. 151 (1930); American R. Exp. Co. v. Davis, 158 Ark. 493, 250 S.W. 540 (1923); Orleans Dredging Co. v. Frazie, 179 Miss. 188, 173 So. 431 (1937) or by an *en banc* decision of the same court, Poe v. Illinois Cent. R. R., 339 Mo. 1025, 99 S.W.2d 82 (1936). This principle has also been applied when the mandate of the court is affected by intervening statutory enactment, Petty v. Clark, 113 Utah 205, 192 P.2d 589 (1948); Donaldson v. Chase Securities Corp., 216 Minn. 269, 13 N. W.2d 1 (1943), aff'd 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); cf. Danforth v. Groton Water Co., 178 Mass. 472, 59 N.E. 1033 (1901); Albanese v. McGoldrick, 129 N.Y.S.2d 269 (Sup.Ct.1954). The same principle should apply here; any limiting language in the Supreme Court mandate should not preclude judicial application of the Amendment in this case for the rule of law expressed by

the mandate has been affected by a subsequently enacted federal statute.

. . . Moreover, as the court below may have indicated, 243 F.Supp. [957] at 971, there may well be a constitutional objection to an application of the mandate here. The law of the case is not based on any constitutional authority but is only a doctrine of judicial administration based on the practice of the courts, Messenger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); King v. State of West Virginia, 216 U.S. 92, 100, 30 S. Ct. 225, 54 L.Ed. 396 (1910). A federal statute, on the other hand, is an assertion of its constitutional power by Congress and is entitled to respect as the supreme law of the land.· U.S. Const. art. VI, cl. 2. It is questionable whether the courts may frustrate such a statute by interposing a judge-made rule of practice.

Thus we hold that Congress intended that the Hickenlooper Amendment should apply to cases pending at the time of its enactment, including this case." 383 F.2d at 178.

While no other case has considered the precise issue, a closely analogous issue is discussed in Lennig v. New York Life Ins. Co., 130 F.2d 580 (3d Cir. 1942). In a post-*Erie* diversity case it was contended on remand that an authoritative pronouncement of Pennsylvania law inconsistent with the mandate of the Third Circuit had been made by a Pennsylvania court. Judge Jones wrote:

"If, as the learned trial judge apprehended, the later decision in the Whigham case [Whigham v. Metropolitan Life Ins. Co., 343 Pa. 149, 22 A. 2d 704] interpreted the law of Pennsylvania differently than we had perceived it to be in our earlier opinion, then the court below was quite right in applying to the retrial of this case the rule if and as made plain subsequently by binding state court decision. This is necessarily so. The duty resting upon a federal court, in appropriate circumstances, is to ascertain and apply local law and not to make it. But, where a federal court of appeals in a given case has ascertained and applied what it apprehends to be the pertinent state law, such ascertainment of the local law is binding upon the trial court at the retrial of the case unless it is clearly made to appear by subsequent statute, no more than declaratory, or by binding state court decision that the law of the state was other than what the federal appellate court had understood it to be." 130 F.2d at 581.

The quotation is dictum since this court found no inconsistency between the Pennsylvania case relied on and its earlier mandate. But it suggests that the rule in this circuit, as in the Second Circuit, is that the law of the case announced in an appellate court's mandate yields to a different pronouncement of law by a body having substantive lawmaking competence.

A partisan of judicial review is tempted to embrace the broader reading of United States v. Klein, *supra*, suggested in Judge Seitz' opinion. I resist that temptation, however, for the application of the *Klein* rule to nonconstitutional rules of decision would involve the same error with respect to the powers of the judicial branch as the majority commits with respect to the powers of the executive branch. The statute involved in *Klein* was the last effort by the Radical Republicans in Congress to prevent the Court by a constitutional decision from interfering with congressional reconstruction. *Klein* must be read in conjunction with Ex parte McCardle, 74 U.S. (7 Wall.) .506, 19 L.Ed. 264 (1869) and Ex parte Yerger, 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1869). By 1872 the fourteenth and fifteenth amendments had been ratified and it became feasible for the *Klein* Court to fence off the constitutional turf which it had surrendered in *McCardle* and reclaimed with inconclusive results, because the case was settled, in *Yerger*. The Court

was on perfectly sound ground in asserting that it, not Congress, was the final arbiter of the meaning of the Constitution. It was on equally sound ground in asserting that the legislature could not dictate to a court what facts could·be found. But an assertion that because a case is sub judice the legislature is deprived of legislative competence in a matter otherwise the proper subject of legislation is a violation of the principle of separation of powers. The judicial branch no less than the executive and the legislative, has limited powers under the Constitution.

Thus I conclude that unless the decision of the Supreme Court on the ex parte determination of arguable relevance is a decision of constitutional law, we should apply § 3504(a)(2) rather than the mandate.

Examining that part of Justice White's opinion of the Court dealing with the in camera examination issue does not suffice to determine whether the Court was laying down a due process requirement or a rule of criminal procedure. He speaks of the superiority of adversary proceedings as a means for obtaining justice in cases where an issue must be decided on the basis of a large volume of factual materials. 394 U.S. at 183–185, 89 S.Ct. 961. He carefully avoids any mention of fifth amendment due process or sixth amendment assistance of counsel. None of the other opinions in the case suggest that he rejected the ex parte in camera device on constitutional grounds. How' much we can deduce from silence is problematical. But a good starting point for interpreting the opinion is the fact that the dispute over the electronic surveillances in no way affects the integrity of the fact-finding process. The exclusionary rule involves the implementation of a judicial policy against becoming involved as accessories to the government's lawlessness and of deterring such lawlessness in the future. It excludes perfectly reliable evidence. Thus an error by the district judge in an ex parte in camera examination of the logs would in no way prejudice the defendant on the issue of his guilt or innocence. *Cf.* United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); Brinegar v. United States, 338 U.S. 160, 172–173, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). From this, and Justice White's silence, I conclude that he announced a rule of criminal procedure rather than a rule of constitutional law. This being so I would direct the district court on remand to make the taint determination in the first instance pursuant to 18 U.S.C. § 3504(a)(2), and to disclose only such part of the second set of surveillance records as it finds may be relevant to the evidence used at the trial.